# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELK RUN COAL COMPANY, INC., et al., ) ) ) | |
| Plaintiffs, ) ) | Civil No. 10-01056-RJL |
| v. ) ) | |
| UNITED STATES DEPARTMENT OF LABOR, et al., ) ) ) | |
| Defendants. ) ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Dated: August 24, 2010

Respectfully submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

JUDRY L. SUBAR
Assistant Branch Director

 _/s/ Christopher R. Hall_____
CHRISTOPHER R. HALL
U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C.  20530
(202) 514-4778

## INTRODUCTION

For all its prolixity, Plaintiffs' Complaint neither demonstrates how this Court could possess jurisdiction over this case nor states anything resembling an actionable claim.  Plaintiffs, six operators of underground coal mines, appear to allege that they have suffered stonewalling at the hands of the Department of Labor, the Mine Safety and Health Administration ("MSHA"), and several MSHA officials.  Their Complaint alleges at length that Defendants have "refused to approve" an unspecified number of unidentified proposed ventilation plans for their mines, and that as a consequence their ability to operate those mines – and extract profits from them – has been impaired or even foreclosed.  According to Plaintiffs, Defendants' conduct amounts to violations of their procedural and substantive rights under the Due Process Clause, constitutes ultra vires action, and violates the Administrative Procedure Act.  But the allegations of fact on which Plaintiffs base these legal assertions are vague to the point of frustration and virtually barren of detail.  Indeed, it appears that Plaintiffs have actively avoided making any detailed factual allegations for some reason.  On that basis alone, this case should be dismissed.

To the extent Plaintiffs' Complaint alleges anything that could be deemed a claim sufficiently plausible to be actionable, it is clear that any such claims fall outside of this Court's subject-matter jurisdiction under Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207 (1994).  In Thunder Basin, the Supreme Court held that operator challenges to MSHA's enforcement of the Federal Mine Safety and Health Act of 1977 ("Mine Act") are not within federal district court subject-matter jurisdiction, but instead must be adjudicated through the administrative review process established under the Mine Act, unless they are "wholly collateral" to the Mine Act.  There is no substantive difference between the facts of Thunder Basin, where the Supreme Court

1

found district court jurisdiction to be precluded, and the spare allegations of factual matter here. The outcome should thus be the same: dismissal of Plaintiffs' Complaint for lack of jurisdiction. Indeed, Plaintiffs appear so defensive about this point that they go out of their way to argue in the jurisdictional section of their Complaint that their claims are not so much "collateral" to the Mine Act but are "in fact completely independent" of it, and therefore outside the reach of <u>Thunder Basin</u>. However Plaintiffs elect to phrase their jurisdictional averment, it is incorrect.

Alternatively, even were the Court to conclude that Plaintiffs have pleaded any claims that escape the reach of <u>Thunder Basin</u>, their Complaint should nonetheless be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. Plaintiffs must plead sufficient allegations of fact to demonstrate that their claims are "plausible" on the face of the Complaint to withstand a Rule 12(b)(6) motion. Plaintiffs have failed to do so here. Their various claims – that their rights under the Due Process Clause and the Administrative Procedure Act have been violated and that Defendants have acted <u>ultra vires</u> – are neither adequately pled nor legally sufficient.

## **BACKGROUND**

### I.   **GENERAL STATUTORY AND REGULATORY BACKGROUND.**

Congress enacted the Federal Mine Safety and Health Amendments Act of 1977, 30 U.S.C. § 801 <u>et seq.</u>, known familiarly as the Mine Act, "to protect the health and safety of the Nation's coal or other miners." 30 U.S.C. § 801(g). The Mine Act amended the Federal Coal Mine Health and Safety Act of 1969 ("Coal Act"), 30 U.S.C. § 801 <u>et seq.</u> (1976). In enacting the Mine Act, Congress recognized "an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's . . . mines . . . in

2

order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines." 30 U.S.C. § 801(c).

The Mine Act responds to that need in part by authorizing the Secretary of Labor to promulgate mandatory safety and health standards for all mines and to conduct regular safety inspections of all mines. 30 U.S.C. §§ 811, 813. The Mine Safety and Health Administration ("MSHA") is established within the Department of Labor and represents the Secretary in enforcing the Mine Act. 29 U.S.C. § 557a.

The Mine Act also establishes a detailed and comprehensive structure for reviewing violations of "any mandatory health or safety standard, rule, order, or regulation promulgated under the Act." 30 U.S.C. § 814(a). Of particular significance, challenges to enforcement are reviewed by the Federal Mine Safety and Health Review Commission, 30 U.S.C. §§ 815, 823 ("Commission"), which is independent of both the Department of Labor and MSHA. Decisions of the Commission, in turn, are reviewed by the appropriate United States court of appeals, id. § 816. See Background Part III, infra.

## II.   THE VENTILATION PLAN APPROVAL PROCESS.

Operators' compliance obligations under the Mine Act are not limited to mandatory standards promulgated by the Secretary pursuant to 30 U.S.C. §§ 811 and 813. The Mine Act also requires operators to adopt ventilation system and methane and dust control plans "suitable to the conditions and . . . mining system[s]" of their mines, referred to generally as "ventilation plans." 30 U.S.C. § 863(o). A proposed ventilation plan must be approved by MSHA to become effective, id., and cannot be implemented before it is approved by the MSHA district manager. 30 C.F.R. § 75.370. Upon the approval of a proposed ventilation plan by MSHA and its adoption

by the mine operator, the provisions of the ventilation plan become enforceable as mandatory standards. Jim Walter Resources, Inc., 9 FMSHRC 903, 907 (1997). Accord United Mine Workers of America v. Dole, 870 F.2d 662, 667 n.7 (D.C. Cir. 1989); Zeigler Coal Co. v. Kleppe, 536 F.2d 398, 409 (D.C. Cir. 1976).

As a general matter, an operator must submit a proposed ventilation plan, or proposed revisions to an existing ventilation plan, when: (1) the operator seeks to make "[a]ny intentional change to the ventilation system [of its mine] that alters the main air current or any split of the main air current in a manner that could materially affect the safety and health of the miners;" or (2) there are any changes to the working conditions of the mine of the sort specified in 30 C.F.R. § 75.371. See 30 C.F.R. § 75.370(d). Independent of an operator's obligation to submit a new proposed ventilation plan or proposed revisions to an existing plan when it faces or contemplates the sort of changes specified in the regulations, MSHA itself is obligated by regulation to review the ventilation plan for each mine every six months "to assure that it is suitable to current conditions in the mine." Id. § 75.370(g).

Substantively, the specific content of any required mine operation plan must be determined through good-faith consultation between the mine operator and the MSHA district manager. See UMWA v. Dole, 870 F.2d at 666 (discussing roof control plans). This good-faith consultation includes at least two "key elements:" (1) the provision of notice as to each party's position; and (2) adequate discussion of disputed positions. C.W. Mining Co., 18 FMSHRC 1740, 1747 (1996) (roof control plan). As part of the consultation process, the MSHA district manager is required to evaluate alternative procedures suggested by the operator. Id. at 672 (citing Carbon County Coal Corp., 1984-1985 OSH (CCH) Par. 27,385, 7 FMSHRC 1576 (1985)

4

(roof control plan)); C.W. Mining, 18 FMSHRC at 1746.  Although the specific content of a plan must be based upon the consideration of mine-specific conditions, UMWA v. Dole, 870 F.2d at 670-72; Carbon County Coal, 7 FMSHRC at 1371, the ultimate content of such a plan need not be uniquely tailored to a particular mine.  C.W. Mining, 18 FMSHRC at 1740; accord, UMWA v. Dole, 870 F.2d at 672.

Ultimately, upon the conclusion of the good-faith consultation process, the MSHA district manager is required to notify an operator "in writing of the approval or denial of approval of a proposed ventilation plan or proposed revision."  30 C.F.R. § 75.370(c)(1).  If approval is denied, "the deficiencies of the [proposed] plan or revision shall be specified in writing and the operator will be provided an opportunity to discuss the deficiencies with the district manager."  Id. § 75.370(c)(ii).  Neither the Mine Act nor MSHA regulations set a time limit within which MSHA must issue a decision approving or denying a plan or revision request, but MSHA's Mine Ventilation Plan Approval Handbook provides that such requests "should be handled efficiently with an effort to complete all requests of any proposed plan, revision, or change in a time period of 45 calendar days."  MSHA Handbook No. PH92-V-6, Chap. 3.[1]

On occasion, MSHA and an operator reach an impasse concerning one or more ventilation plan provisions.  In such a situation, the operator may initiate the administrative review process by refusing to adopt the plan and requesting that the Secretary issue a citation for what is known as a "technical violation."  See S. Report No. 109-365, 109th Cong. 2d Sess. at 3-4 (Dec. 6, 2006); see also Zeigler, 536 F.2d at 407.  The technical violation procedure has been

---

[1]  See http://www.msha.gov/READROOM/HANDBOOK/PH92-V-6.pdf for MSHA Handbook No. PH92-V-6.  As explained in its preface, the Handbook provides guidance and instructions "to all MSHA coal enforcement personnel."  See id.

well-accepted as a means for resolving impasses for some time.  As the Senate Committee on

Health, Education, Labor, and Pensions noted in explaining the basis for 2006 legislation that

amended the Mine Act in several respects:

> [T]he committee opted to utilize a procedure with which the parties
> are familiar as a means of resolving [disputes as to safety plan
> provisions].  Thus, where a dispute regarding the approval or content
> of a plan arises between the Secretary and an operator, the Secretary
> will issue a citation with regard to the underlying issue.  Use of a
> "technical violation" and accompanying citation is the means by
> which roof and ventilation plan disputes are traditionally reviewed.

S. Report No. 109-365, 109th Cong. 2d Sess. at 3-4 .[2]  The operator may seek review of such a

technical violation before the Commission and, if need be, appeal any adverse Commission

decision to the appropriate Court of Appeals.  Id.; see also Zeigler, 536 F.2d at 407.

## III.  THE ADMINISTRATIVE REVIEW PROCESS.

Following the issuance of any citation, including one for a technical violation as

described in Background Part II, supra, an operator may seek review from the Commission.  An

operator has thirty days to challenge before the Commission any citation issued under the Mine

Act, after which time an uncontested order becomes "final" and "not subject to review by any

court or agency."  30 U.S.C. §§ 815(a), (d).  Timely challenges are heard by an Administrative

Law Judge, or ALJ, id. § 823(d)(1), followed by possible Commission review.  Id. § 823(d)(2).

The Commission exercises discretionary review over any case involving, inter alia, a "substantial

question of law, policy or discretion."  Id. § 823(d)(2)(A)(ii)(V).  Likewise, it may review on its

own initiative any decision "contrary to law or Commission policy" or in which "a novel

---

[2]  Mine Improvement and New Emergency Response Act of 2006, Pub. L. No. 109-236,
120 Stat. 493 (2006) ("MINER Act").

6

question of policy has been presented." Id. § 823(d)(2)(B).  Only the Commission has the authority to actually impose civil penalties proposed by the Secretary, id. § 820(i), and it reviews all proposed civil penalties de novo.  Id.  The Commission is also empowered to grant temporary relief to an operator pending review of most orders, id. § 815(b)(2), and it must expedite such review where necessary.  Id. § 815(d).

An operator may challenge an adverse Commission decision in the appropriate court of appeals, whose jurisdiction "shall be exclusive and its judgment and decree final" except for possible Supreme Court review.  Id. § 816(a)(1).[3]  The court of appeals must uphold findings of the Commission that are substantially supported by the record, id., but may grant temporary relief pending final determination of most proceedings.  Id. § 816(a)(2).

The Mine Act expressly authorizes district court jurisdiction in only two provisions, 30 U.S.C. §§ 818(a) and 820(j).  The first, Section 818(a), empowers the Secretary to seek district court review to, inter alia, enjoin habitual operator violations of health and safety standards.  Id. § 818(a).  The second, Section 820(j), empowers the Secretary to seek judicial enforcement of civil penalties.  Id. § 820(j).  By contrast, operators possess no corresponding right to seek district court review, but instead "are to complain to the Commission and then to the court of appeals." Thunder Basin, 510 U.S. at 209 & n.11.

## PLAINTIFFS' COMPLAINT

According to their Complaint, Plaintiffs comprise six underground coal mine operators; collectively, they operate at least fourteen mines.  Compl. ¶¶ 11-17, 51.  Plaintiffs' claims appear

---

[3]  The appropriate court of appeals is either: (1) the court of appeals for the circuit in which the violation is alleged to have occurred; or (2) the D.C. Circuit.  30 U.S.C. § 816(a)(1).

to rely upon essentially identical allegations of fact concerning each of those fourteen mines.  On unspecified dates, Plaintiffs each allegedly submitted proposed ventilation plans or proposed revisions to existing plans.  See, e.g., id. ¶¶ 45-46.  Defendants allegedly have not approved Plaintiffs' proposed ventilation plans or proposed revisions; at various points in their Complaint, Plaintiffs characterize Defendants as having "refused to approve or even act upon" their proposed plans.  Id. ¶ 45.  In other unspecified instances, Defendants are alleged to have conditioned approval of Plaintiffs' proposed plans or revisions upon arbitrary grounds under a "one-size-fits-all" approach that does not sufficiently account for specific conditions or mining systems at Plaintiffs' mines.  Id. ¶ 86.  Finally, in still other unspecified instances, Defendants are alleged to have insisted that Plaintiffs' proposed ventilation plans: (1) omit the use of equipment known as scrubbers; (2) rely exclusively on exhausting ventilation systems; (3) specify the construction of artificial ventilation that allegedly restrict airflow (and thus allegedly inhibit the dilution of methane and other toxic gases); and (4) mandate the use of miners to evaluate the effectiveness of "bleeder entries."  Id. ¶¶ 46, 86.

Based upon these allegations of fact, Plaintiffs assert seven counts.  Five Counts are substantive – Counts One, Three, Four, Five, and Six.  Id. ¶¶ 56-63, 68-76, 77-78, 79-83, 84-87.  The remaining two – Counts Two and Seven – seek declarations as to Plaintiffs' rights under the Declaratory Judgment Act, 28 U.S.C. § 2201.  Id. ¶¶ 64-67, 88-91.

Counts One, Three, and Five allege violations of the Due Process Clause under two theories.  Count One alleges that the Mine Act itself violates Plaintiffs' procedural Due Process rights because it does not contain a dispute-resolution procedure that would allow Plaintiffs to resolve potential impasses and thus prevent Defendants from "refusing to approve" Plaintiffs'

proposed ventilation plans or revisions or conditioning approval upon "arbitrary grounds." Compl. ¶¶ 56-63.  Count Three alleges that Defendants have violated Plaintiffs' procedural Due Process rights by "disapprov[ing] or fail[ing] to approve" their proposed ventilation plans unless such plans adopt (or omit) the four measures described above.  Id. ¶¶ 68-76.  Count Five alleges that Defendants have violated Plaintiffs' substantive Due Process rights in apparently the same respects.  Id. ¶¶ 79-83.

Count Four appears to allege that Defendants have acted outside of their statutory authority under the Mine Act – and therefore ultra vires – by "disapprov[ing] or fail[ing] to approve" Plaintiffs' proposed ventilation plans unless such plans adopt (or omit) the four measures identified in Count Three.  Id. ¶¶ 77-78.

Finally, Count Six appears to allege that Defendants have violated the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"), by "disapprov[ing] or fail[ing] to approve" Plaintiffs' proposed ventilation plans unless such plans adopt (or omit) the four measures identified in Count Three.  Id. ¶¶ 84-87.

Of note, Plaintiffs' Complaint names as Defendants three MSHA officials – Kevin Stricklin, Administrator of MSHA Division of Coal Mine Safety and Health; Robert Hardman, District Manager for MSHA Coal District 4; and Norman Page, District Manager for MSHA Coal District 6.  Id. ¶¶ 20-22.  Plaintiffs expressly assert both official- and individual-capacity claims against each.  Id.  However, Plaintiffs seek only injunctive and declaratory relief, and do not purport to seek damages against Defendants Stricklin, Hardman, or Page.  Id., Prayer for Relief ¶¶ (a) to (i).

Noticeably absent from the Complaint are any specific allegations of fact concerning

Defendants' supposed violations of Plaintiffs' rights.  The Complaint does not identify by date, case number, or any other descriptor the submissions allegedly submitted by Plaintiffs to which the Complaint is supposed to relate.  Nor does the Complaint allege with any factual specificity how Plaintiffs' rights have been violated or what supposed harm they have sustained.

## ARGUMENT

Plaintiffs' complaint is essentially a legal cipher – their allegations of fact lack both substance and specificity, and make it difficult to know precisely what they seek to challenge as a matter of law.  What is clear, however, is that their claims fall outside of this Court's jurisdiction under Thunder Basin, and thus must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).  Even if the Court concludes otherwise as to any of Plaintiffs' Counts, any such Counts must be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[4]

## I.    APPLICABLE LEGAL STANDARDS.

Federal courts are courts of limited jurisdiction and possess only that power which is given to them by the Constitution and by federal statutes.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Plaintiffs must demonstrate that the federal court possesses jurisdiction over their claims.  See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 182 (1936) ("It is incumbent upon the plaintiff properly to allege the jurisdictional facts, according to

---

[4]  As noted supra, Plaintiffs assert claims against Defendants Stricklin, Page, and Hardman in both their individual and official capacities.  Plaintiffs' official-capacity claims against these Defendants do not constitute claims against them, but rather claims against the Department of Labor as the real party in interest, see, e.g., Hatfill v. Gonzales, 519 F. Supp. 2d 13, 23-24 (D.D.C. 2007) (citing cases), and thus should be dismissed for the reasons set forth as to all Defendants herein.  Plaintiffs' individual-capacity claims should be dismissed because they only seek declaratory and injunctive relief, and such relief can only be obtained from government officers in their official capacity.  Id. at 26-27 (citing cases).

the nature of the case.").  If Plaintiffs fail to do so, the Court should dismiss the case pursuant to

Fed. R. Civ. P. 12(b)(1) or of its own volition.  See Ruhrgas AG v. Marathon Oil, 526 U.S. 574,

583 (1999) ("[S]ubject-matter [jurisdiction] must be policed by the courts on their own initiative

. . . .") (citing Fed. R. Civ. P. 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction

of the subject matter, the court shall dismiss the action.").

Similarly, the Court must dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6) where

it fails to state a claim for which relief can be granted.  To withstand a motion to dismiss under

Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, — U.S. —, 129 S. Ct.

1937, 1949 (2009) (citing Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).  Under Iqbal and

Twombly, "[a] claim has facial plausibility when the pleaded factual content allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129

S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).  "Plausibility" represents something less than

"probability," but it does require "more than a sheer possibility that a defendant has acted

unlawfully."  Id.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"

Id. (quoting Twombly, 550 U.S. at 557).  Thus, if the facts alleged in a complaint do not suggest

more than the "mere possibility" of a violation, the complaint has failed to show that the plaintiff

is entitled to relief, as required by Fed. R. Civ. P. 8(a)(2), and cannot survive the application of

Fed. R. Civ. P. 12(b)(6).  See, e.g., Atherton v. D.C. Office of the Mayor, 567 F.3d 672, 688

(D.C. Cir. 2009); American Petroleum Inst. v. Technomedia Int'l, 699 F. Supp. 2d 258, 265

(D.D.C. 2010) (Leon, J.) ("To survive dismissal, it is not enough to plead a statement of facts

"that merely creates a suspicion [of] a legally cognizable cause of action.") (quoting Twombly, 550 U.S. at 555; other internal quotations and citations omitted).

Likewise, a complaint cannot substitute conclusions of law and other conclusory assertions for well-pleaded allegations of fact and hope to withstand a motion to dismiss.  In particular, conclusions of law are not to be accepted as true.  Iqbal, 129 S. Ct. at 1937.  By the same token, "bare assertions, [which] amount to nothing more than a 'formulaic recitation of the elements' of a . . . claim," are "not entitled to be assumed true."  Id.; Soliman, M.D., v. George Washington Univ., — F. Supp. 2d —, No. 08-cv-1137, 2010 WL 3153942, *2 (D.D.C. Aug. 6, 2010) (Leon, J.) (citing Twombly, 550 U.S. at 555).

Plaintiffs' Complaint is insufficient, under these standards, to entitle them to proceed with this matter.

## II.   PLAINTIFFS' CLAIMS FALL OUTSIDE OF FEDERAL DISTRICT COURT SUBJECT-MATTER JURISDICTION UNDER THUNDER BASIN AND MUST BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(1).

In cases involving "delayed judicial review" of final agency actions – that is, where appeal can be taken to the court of appeals after the completion of administrative proceedings – courts must conclude that Congress "has allocated initial review to an administrative body where such intent is 'fairly discernible in the statutory scheme.'"  Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207 (1994) (quoting Block v. Cmty Nutrition Inst., 467 U.S. 340, 351 (1984)) (internal citations and quotations omitted); Sturm, Ruger & Co. v. Chao, 300 F.3d 867, 872 (D.C. Cir. 2002).  "Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review."  Thunder Basin, 510 U.S. at 207.  If a district court determines that

12

Congress has vested initial review of an action in an administrative body, it must dismiss the action for lack of subject-matter jurisdiction.  Id.

Under circumstances remarkably similar to those here, the Supreme Court in Thunder Basin held that the Mine Act precluded district court jurisdiction over "pre-enforcement" claims asserted by a mine operator against MSHA.  Id. at 208-09.  In Thunder Basin, the operator's employees had selected two employees of the United Mine Workers, neither of them employees of the mine, to serve as their representatives under § 813(f) of the Mine Act.  Id. at 205.  After some back-and-forth, MSHA instructed the operator to post the miners' representative designations as required by the Mine Act and an implementing MSHA regulation.  Id.  Instead of complying, the operator filed suit against MSHA in federal district court seeking an injunction against enforcement of the regulation.  Id.  The operator's arguments were two-fold: (1) designation of non-employee union representatives violated its rights under the National Labor Relations Act ("NLRA"), 29 U.S.C. 141 et seq.; and (2) requiring it to challenge MSHA's interpretation of the statute and MSHA's own regulation through the Mine Act's statutory review process would violate the Due Process Clause by forcing it to choose between violating the Act and incurring penalties on the one hand, or complying and suffering irreparable harm as a consequence on the other.  Id.  The Supreme Court held that both of these pre-enforcement claims fell outside district court jurisdiction based on the Act's comprehensive statutory review procedure and its legislative history.  Id. at 207-08; Sturm, Ruger, 300 F.3d at 872.[5]

First, the Supreme Court noted that the Mine Act "establishes a detailed structure for

---

[5]  As to "post-enforcement" claims – those asserted after MSHA has issued a citation – the Court noted that the language of the Mine Act itself makes clear that district courts lack jurisdiction.  Id. at 208.

reviewing violations" of MSHA standards and regulations that "does not distinguish between pre-enforcement and post-enforcement challenges, but applies to all violations of the Act and its regulations." Id. at 207-09.  For both pre- and post-enforcement challenges to MSHA action, an operator must file its challenge before the Commission within thirty days of receiving the citation at issue to be heard by an administrative law judge, or ALJ, with possible Commission review to follow.  Id. at 207-08.  If the operator receives an adverse decision from the Commission, it may appeal such decision to the appropriate court of appeals, "whose jurisdiction 'shall be exclusive and its judgment and decree shall be final' except for possible Supreme Court review."  Id. at 208 (quoting 30 U.S.C. § 816(a)(1)).  As the Court further noted, only in two provisions does the Act expressly authorize district court jurisdiction – one empowers the Secretary "to enjoin habitual violations of health and safety standards," and the other empowers the Secretary "to coerce payment of civil penalties."  Id. at 209.  By contrast, the Court emphasized, "[m]ine operators enjoy no corresponding right but are to complain to the Commission and then to the court of appeals."  Id.

Second, the Supreme Court emphasized that the legislative history of the Mine Act demonstrates Congress' clear concern with "strengthen[ing] and streamlin[ing] health and safety enforcement requirements" in comparison to the weak and cumbersome provisions in effect prior to the Act's 1977 passage.  Id. at 209-11.  Of particular significance to the Court was Congress' explicit elimination of mine operators' power to seek de novo review of MSHA actions in the district courts.  Id. at 211.  The Mine Act's statutory predecessor, the Federal Coal Mine Health and Safety Act of 1969 ("Coal Act"), permitted operators to contest civil-penalty assessments de novo in district court upon the completion of the administrative review process.  Id.  That review

14

scheme coincided historically with a period marked by "frequent and tragic mining disasters," which "testified to the ineffectiveness of then-existing enforcement measures." Id. at 209-10.  At the time of the Mine Act's passage, for example, "at least 1 worker was killed and 66 miners were disabled every working day in the Nation's mines." Id. at 209.  Congress concluded that the availability of de novo district court review of civil-penalty assessments significantly contributed to this tragic record by "seriously hamper[ing] the collection of civil penalties," and determined that "improved penalties and enforcement measures" were necessary to address the problems. Id. at 210-11.  One of those essential improvements was the elimination of de novo district court review. Id. at 211.  The Court thus found this legislative history "to be persuasive evidence that Congress intended to direct ordinary challenges under the Mine Act to a single review process," whether such challenges arise pre- or post-enforcement. Id.

Only where an operator's claims are "wholly collateral and outside the agency's expertise" – and "particularly where a finding of preclusion could foreclose all meaningful judicial review" – might such claims fall within district court jurisdiction under Thunder Basin. Id. at 212-13 (citing Heckler v. Ringer, 466 U.S. 602, 618 (1984), Mathews v. Eldridge, 424 U.S. 319 (1976)) (internal quotations omitted).  But despite the fact that the operator's statutory claim in Thunder Basin required the Commission to construe an entirely separate statutory scheme – that of the NLRA – as well as the Mine Act, the Court held that such claim was neither collateral to the Mine Act nor outside the Commission's expertise:  "Although the Commission has no particular expertise in construing statutes other than the Mine Act, we conclude that exclusive review before the Commission is appropriate since 'agency expertise [could] be brought to bear on' the statutory questions presented []." Id. at 214-15 (quoting Whitney Nat'l Bank in Jefferson

Parish v. Bank of New Orleans & Trust Co., 379 U.S. 411, 420 (1965)).  Likewise, the Court

concluded that even the operator's Due Process claim could and should be addressed by the

Commission and then by the applicable court of appeals, if necessary:

> As for petitioner's constitutional claim, we agree that "[a]djudication of the
> constitutionality of congressional enactments has generally been thought beyond the
> jurisdiction of administrative agencies.  This rule is not mandatory, however, and is
> perhaps of less consequence where, as here, the reviewing body is not the agency
> itself but an independent commission established exclusively to adjudicate Mine Act
> disputes.  The Commission has addressed constitutional questions in previous
> enforcement proceedings.  Even if this were not the case, however, petitioner's
> statutory and constitutional claims here can be meaningfully addressed in the Court
> of Appeals.

Id. at 215 (internal citations omitted).

Plaintiffs' claims here – to the extent they can be discerned – are analogous to those

brought by the operator in Thunder Basin, and likewise fall outside the Court's jurisdiction.  At

their core, Plaintiffs' claims represent variations on a trio of themes:

- Defendants have "refused to approve" Plaintiffs' proposed ventilation plans, or
  have conditioned approval upon allegedly arbitrary grounds under a "one-size-fits
  all" approach that does not sufficiently account for specific conditions or mining
  systems at Plaintiffs' mines.  Compl. ¶¶ 46, 50, 61, 86.

- The Mine Act itself allows Defendants to stonewall Plaintiffs' proposed
  ventilation plans because it does not provide for any "dispute-resolution"
  procedure to resolve impasses.  Id. ¶ 62.

- Defendants have acted in bad faith by "disapprov[ing] or fail[ing] to approve"
  Plaintiffs' proposed ventilation plans unless such plans: (1) omit the use of
  scrubbers; (2) rely exclusively on exhausting ventilation systems; (3) specify the
  construction of artificial ventilation controls that allegedly restrict airflow (and
  thus allegedly inhibit the dilution of methane and other toxic gases); and (4)
  mandate the use of miners to evaluate the effectiveness of "bleeder entries."  Id.
  ¶¶ 46, 74, 78.

Whether asserted as alleged violations of the Due Process Clause or the APA or characterized as

16

ultra vires conduct outside the statutory authority of the Mine Act, all of these factual allegations "at root require interpretation of the parties' rights and duties" under the Mine Act and Mine Act standards, and thus "fall squarely within the Commission's expertise." Thunder Basin, 510 U.S. at 214. Accordingly, there is no reason why Plaintiffs cannot assert these claims in individual adjudication before the Commission. Sturm, Ruger, 300 F.3d at 875.

Plaintiffs' first alleged factual claim – that Defendants have "refused to approve" or arbitrarily adopted a "one-size-fits all" reaction to their proposed ventilation plans – falls neatly within both the administrative review scheme of the Mine Act and the Commission's expertise. Consideration of such a claim would simply require the Commission to review the negotiations between the operator and MSHA to determine whether each had satisfied its obligation to consult in good faith, see UMWA v. Dole, 870 at 666; C.W. Mining Co., 18 FMSHRC at 1747, whether the MSHA district manager adequately evaluated alternative procedures suggested by the operator, C.W. Mining Co., 18 FMSHRC at 1747, and whether the terms proposed by either party satisfied the requirements of regulatory provisions including 30 C.F.R. § 75.370. Such inquiries are patently within the Commission's expertise whether the legal theories asserted involve the APA or the ultra vires doctrine, as they involve a straightforward application of the Mine Act and MSHA's implementing regulations. Thunder Basin, 510 U.S. at 214. Insofar as Plaintiffs assert these core factual allegations under the Due Process Clause, the relevant legal inquiries are likewise within the Commission's expertise every bit as much as the Due Process claim in Thunder Basin. Id.

Plaintiffs' second alleged factual claim – their suggestion that the alleged lack of a dispute-resolution procedure under the Mine Act means that the Act itself violates their rights to

17

procedural and substantive Due Process – is something of a nullity, and fares no better than their

first.  Fundamentally, its premise is verifiably incorrect.[6]  A comprehensive, effective dispute-

resolution procedure has long existed under the Mine Act: where an operator and MSHA have

reached an impasse as to any provision of a proposed ventilation plan, the operator can simply

request entry of a technical violation.  See S. Report No. 109-365, 109th Cong. 2d Sess. at 3-4

(Dec. 6, 2006); see also Zeigler, 536 F.2d at 407.  Under the technical violation procedure,

MSHA issues a citation, which enables the operator to seek immediate administrative review

from the Commission, which is independent of MSHA.  Zeigler, 536 F.2d at 407.  Inexplicably,

Plaintiffs do not so much as acknowledge this process, much less attempt to articulate why they

do not believe it would suffice in this case.

More to the point here, though, district court review of this alleged factual claim is

foreclosed by Thunder Basin.  As with the operator's claims there, this claim is squarely within

the authority and expertise of the Commission to review, as it requires an analysis of whether

MSHA is improperly using the review mechanisms set forth by the Mine Act, agency regulations,

and administrative gloss to "stonewall" these operators, as alleged.  Plaintiffs' half-hearted effort

to cast this alleged factual claim as a pseudo-facial challenge to the Mine Act itself does nothing

to alter either this proposition or the conclusion that the claim falls outside federal district court

jurisdiction.  As the First Circuit emphasized in concluding that a multiple-plaintiff challenge to

a Department of Labor requirement was not collateral to the statutory review scheme under the

analogous Occupational Safety and Health Act ("OSH Act") under Thunder Basin, "calling an

---

[6]  This claim would thus require dismissal under Fed. R. Civ. P. 12(b)(6), even if jurisdiction existed.  See Argument Part II.A, infra.

18

issue 'collateral' does not make it so." Eastern Bridge, LLC v. Chao, 320 F.3d 84, 90 (1ˢᵗ Cir.

2003). "[S]uccessful pattern and practice challenges involve attacks on fundamentally flawed

administrative procedures that prevent challengers from obtaining meaningful review." Id. at 90-

91. Here, Plaintiffs obviously do not assert that the administrative review procedures that apply

to their claims are "fundamentally flawed" – indeed, their Complaint utterly fails to acknowledge

the very existence of those procedures. Rather, like the plaintiffs in Eastern Bridge, Plaintiffs

"are only challenging the underlying substantive conduct of the agency . . . ." Id. at 91. As in

Eastern Bridge, if this Court were to allow Plaintiffs claims "to fit into the pattern and practice

exception, then the exception would swallow the rule." Id.

Plaintiffs' third alleged factual claim – that Defendants have acted in bad faith by

"disapprov[ing] or fail[ing] to approve" Plaintiffs' proposed ventilation plans unless Plaintiffs

omit or include various specified measures – falls squarely within the administrative review

scheme for the same reason as Plaintiffs' first claim. It is plainly within the Commission's

expertise to evaluate the proposed use of scrubbers; to weigh the value of exhausting ventilation

systems versus any proposed alternatives; to assess the advantages and disadvantages of the use

of artificial ventilation controls; and to measure the appropriateness of using mine examiners to

evaluate the effectiveness of bleeder entries. Thunder Basin, 510 U.S. at 214.

One final point. Plaintiffs' strategy to evade the reach of Thunder Basin appears to

involve asserting essentially identical claims on behalf of six mine operators that collectively

operate fourteen mines. See Pls.' Compl. ¶¶ 7, 51. But Plaintiffs cannot escape Thunder Basin

simply by multiplying their claims and then suggesting that their own orchestrated multiplication

suggests a "pattern and practice" of any sort on the part of MSHA, much less a pattern and

practice that would shift these quintessential Mine Act claims entirely out of the Mine Act's comprehensive administrative review process.  See Eastern Bridge,, 320 F.3d at 90 ("[C]alling an issue 'collateral' does not make it so.").  A single set of claims brought by one mine operator asserting these allegations of fact would fall squarely within the ambit of Thunder Basin, as shown above.  That Plaintiffs have chosen to duplicate such claims across fourteen mines does nothing to change that essential proposition.

## III.   ALTERNATIVELY, PLAINTIFFS' COMPLAINT MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Even were the Court to conclude that Plaintiffs have pleaded one or more claims that escape the reach of Thunder Basin, their Complaint should nonetheless be dismissed, as it states no claim upon which relief may be granted.  To withstand a motion to dismiss, Plaintiffs' claims "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal,129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).  Plaintiffs' Complaint falls short of that requirement for several reasons.

### A.   PLAINTIFFS' PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAIMS – COUNTS ONE, THREE, AND FIVE – FAIL TO STATE A CLAIM.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).  "Property interests, of course, are not created by the Constitution.  Rather they are created and their

dimensions are defined by existing rules or understandings that stem from an independent source" and "that secure certain benefits and that support claims of entitlement to those benefits." <u>Roth</u>, 408 U.S. at 577.

Only if it found the deprivation of a protected property interest would the Court then "look to see if the [government's] procedures comport with due process." <u>Sullivan</u>, 526 U.S. at 59.  At this second step, the Court applies the <u>Mathews v. Eldridge</u> balancing test, "considering (1) the significance of the private party's protected interest, (2) the government's interest, and (3) the risk of erroneous deprivation and 'the probable value, if any, of additional or substitute procedural safeguards.'" <u>Gen. Elec. Co. v. Jackson</u>, — F.3d —, 2010 WL 2572955, *5 (D.C. Cir. June 29, 2010) (quoting <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976)).

Plaintiffs' Due Process claims, embodied in Counts One, Three, and Five, are deficient in both respects, and should be dismissed accordingly.

### 1. PLAINTIFFS FAIL TO PLEAD THE DEPRIVATION OF ANY PROTECTED PROPERTY INTEREST UNDER THE DUE PROCESS CLAUSE.

Plaintiffs suggest that they have three property interests at stake here: (1) "a safe and healthy work force (<u>i.e.</u>, their miners), for both their sake and the sake of their miners;" (2) "the economic viability of their mining operations;" and (3) "the right to develop and implement their own ventilation plans, provided they are consistent with prudent mining engineering and safety and health practices, suitable to the conditions and mining systems at their respective mines." Compl. ¶¶ 59, 70, 81.  But Plaintiffs fail to plead sufficient factual matter to state a plausible claim that: (1) the asserted interests actually represent property interests protectible under the Due Process Clause or (2) they have suffered any deprivation of such interests.

21

Plaintiffs' first asserted interest – "a safe and healthy [miner] work force" – does not constitute a protectible property interest.[7]  Plaintiffs' suggestion that the safety and health of their miners represents "property" that belongs to them as employers implies a view of their miners as chattel, more or less.  It also harkens back to a Lochner-era conception of economic due process that is both arcane and long-discredited.  As the Supreme Court noted almost half a century ago in Ferguson v. Skrupa, 372 U.S. 726 (1963), there was a time when "the Due Process Clause was used, for example, to nullify laws prescribing maximum hours for work in bakeries, outlawing 'yellow dog' contracts, setting minimum wages for women, and fixing the weight of loaves of bread."  372 U.S. at 729 (mentioning Lochner v. New York, 198 U.S. 45 (1905); other internal citations omitted).  But by 1963, "[t]he doctrine that prevailed in Lochner . . . and like cases – that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely – ha[d] long since been discarded."  Id. at 730.  Nor can Plaintiffs point to any statutory or regulatory provision that would provide them a "claim of entitlement" to the safety and health of their miners; without such a claim, there can be no property interest.  Roth, 408 U.S. at 577.[8]

Moreover, insofar as Plaintiffs could even possess a property interest in "a safe and

---

[7]  Insofar as Plaintiffs allege that their employees possess a property interest in their own safety and health, Compl. ¶ 59, Plaintiffs cannot rely on such an interest to provide them standing to bring suit for their own benefit.  See, e.g., Warth v. Seldin, 422 U.S. 490, 499-500 (1975).

[8]  That is even more the case in an industry as extensively regulated as underground mining.  Cf., e.g., American Hospital Association v. Schweiker, 721 F.2d 170, 183 (7th Cir. 1983) ("There is case law arising out of litigation engendered by the vast growth of governmental regulatory activity in the 1930s and thereafter, which provides precedents strongly supporting the government's right, when undertaking a regulatory scheme, to alter the expectations and obligations of private parties.").

healthy work force" as a matter of law, they plead no allegation of fact that would even suggest

they have been deprived of any such interest.   Plaintiffs suggest that Defendants have established

a "pattern and practice" of "refusing to allow" Plaintiffs to implement certain sound ventilation

practices.  Compl. ¶¶ 46-48. But this bare assertion lacks the support of any alleged "factual

matter."  Iqbal, 129 S. Ct. at 1949.  For instance, Plaintiffs fail to identify when they submitted

such proposals to Defendants, or how long they have waited for any MSHA determination as to

such proposals before asserting in this Court that Defendants have "refused to allow" their

implementation.  At the same time, Plaintiffs conspicuously fail to allege anywhere in their

Complaint that Defendants have actually issued a formal denial as to any of their proposed

ventilation plans.  With no denial alleged in the Complaint, and having failed to allege that they

have been forced to wait for a determination from MSHA for any length of time, much less one

that conceivably could be characterized as "unreasonable," Plaintiffs simply have failed to

surmount the pleading threshold recognized by Iqbal.  Nor can their bare allegations of a "pattern

and practice" get them past that threshold, as bare assertions constituting "nothing more than a

'formulaic recitation of the elements' of a . . . claim" are not entitled to be assumed true.  Id.

(quoting Twombly, 550 U.S. at 557).  The phrase "pattern and practice," no matter how many

times it is repeated in a complaint, constitutes just such a formulaic recitation without specific

allegations of fact.  See, e.g., Cole v. FBI, — F. Supp. 2d —, Civ. No. 09-21-BLG-RFC-CSO,

2010 WL 2541216, *20 (D. Mont. June 17, 2010) (assertions of "pattern and practice" not

entitled to be assumed true); Ismail v. Coney Island Hosp., No. 09-cv-2229, 2010 WL 1292706,

*2 (E.D.N.Y. March 31, 2010) ("pattern and practice" allegations without supporting factual

allegations not accepted as true); Kasica v. Dep't of Homeland Security, 660 F. Supp. 2d 277,

281-82 (D. Conn. 2009) (same).

Finally, Plaintiffs' bare assertions appear to be contradicted elsewhere in their own Complaint.  One of Plaintiffs' central allegations is that Defendants have "refus[ed] to allow the Plaintiffs to use, or to continue to use, scrubbers at the mines identified in this Complaint . . . ," Compl. ¶ 47, and "have refused to approve ventilation plans providing for the use of scrubbers based on reasons that have nothing to do with the specific conditions or circumstances at the given mine," id. ¶ 50.  In between those allegations, however, Plaintiffs concede that "[s]crubbers have long been used by Plaintiffs at their mines to reduce respirable dust exposures and help with the dilution of methane . . . ."  Id. ¶ 49.  This concession would seem to foreclose any allegation that Defendants have habitually deprived Plaintiffs of any asserted property interest in "a safe and healthy work force," at least as to the use of scrubbers.  Because an operator cannot lawfully operate its mine without an approved ventilation plan, it follows that each of Plaintiffs' mines were at some point subject to an approved ventilation plan, and that such plan permitted the use of scrubbers.  Thus, as Plaintiffs' own Complaint concedes, the factual allegations do not support the bare legal assertions of harm.

The second interest asserted by Plaintiffs – "the economic viability of their mining operations" – likewise does not constitute a protectible property interest.  From the face of the Complaint, it is impossible to ascertain what Plaintiffs mean by "economic viability."  It seems possible, however, that they mean the continued operation of each of the mines identified in the Complaint in the way Plaintiffs see fit to operate them.  See, e.g., Compl. ¶¶ 46, 74.  But in an industry as heavily regulated as underground coal mining – particularly as to the safety and health of the miners themselves – that does not constitute a property interest.  Cf., e.g., Comtronics v.

24

<u>Puerto Rico Telephone Co.</u>, 409 F. Supp. 800, 808-10 (D.P.R. 1975) ("Thus it is that a vested interest in existing conditions, be it a license to operate a business, existing building codes or zoning regulations, present rates of interest[], health regulations, or whatever, cannot be asserted against the proper exercise of the police power."). As the court in <u>Comtronics</u> emphasized, "no business can be immunized by existing conditions from future regulation or even prohibition." <u>Id.</u> at 810.

And even if "economic viability" – whatever that term means – could constitute a protectible property interest, Plaintiffs fail to plead allegations of fact that would suggest that there has been a deprivation of any such interest. In this regard (as in the others noted elsewhere in this brief) the allegations of Plaintiffs' Complaint are pointedly barren of factual matter. For instance, Plaintiffs make no factual allegations at all as to how Defendants' conduct might conceivably affect the "economic viability" of their operations. They suggest that without approval of their proposed ventilation plans, "[their] mines cannot operate, and their employees will be put out of work . . . ," <u>id.</u> ¶¶ 59, 70, 81, but again provide no allegations of factual matter beyond these conclusory assertions. That said, even assuming the worst as to Plaintiffs' allegations, Plaintiffs still have not pleaded a "deprivation" of any property interest that might exist in a heavily regulated industry such as this. <u>See, e.g.</u>, <u>Burns Harbor Fish Co. v. Ralston</u>, 800 F. Supp. 722, 729-30 (S.D. Ind. 1992). In <u>Burns Harbor</u>, the court concluded that a state regulatory ban on gill-net fishing did not deprive the plaintiff – a commercial gill-net fisherman – of any property interest in the continued viability of his fishing operation: "The ban no doubt cut into plaintiff's profit margin and may even, as plaintiff contends, have made commercial perch fishing impracticable. However, this risk that such a detriment will result from a newly imposed

25

environmental rule or regulation is faced by most businesses." Id. at 730.  This case is no different.

In addition, Plaintiffs' formulaic assertions simply do not ring true.  The plan review process provides for a straightforward resolution where operators have reached an impasse with MSHA: the operator can request a technical violation and promptly seek administrative review from the Commission, an entity that is entirely independent of MSHA.  See S. Report No. 109-365, 109th Cong. 2d Sess. at 3-4 (Dec. 6, 2006); see also Zeigler, 536 F.2d at 407.

Finally, Plaintiffs' third asserted interest – their "right to develop and implement their own ventilation plans, provided they are consistent with prudent mining engineering and safety and health practices, suitable to the conditions and mining systems at their respective mines" – fails to allege a protectible property interest for much the same reasons.  Compl. ¶¶ 59, 70, 81.  As the Supreme Court has explained, property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source" and "that secure certain benefits and that support claims of entitlement to those benefits."  Roth, 408 U.S. at 577.  Here, that independent source, if any, would be the Mine Act.  But the Mine Act does not provide operators a legitimate claim of entitlement to the "develop[ment] and implement[ation] of their own ventilation plans."  Rather, it requires them to draft and submit proposed ventilation plans which then must be approved by MSHA.  30 U.S.C. § 863(o).  MSHA retains the statutory discretion to approve or deny proposed plans.  Id.; 30 C.F.R. § 75.370.  For that reason, Plaintiffs lack a property interest in the development and implementation of their own plans.  See Town of Castle Rock, 545 U.S. at 756 (a government benefit "is not a protected entitlement if government officials may grant or deny it in their discretion."); see also Sullivan, 526 U.S. at 59 (applicants

26

do not possess property interest in benefit for which they have applied).  Moreover, even approved plans must be revised when there are any changes to the working conditions of the mine of the sort specified in 30 C.F.R. § 75.371, see 30 C.F.R. § 75.370(d), and MSHA itself is obligated by regulation to review ventilation plans every six months "to assure that [they are] suitable to current conditions in the mine[s]."  Id. § 75.370(g).  In short, there is nothing in the Mine Act or in MSHA's regulations that would provide an operator a legitimate claim of entitlement to the development and implementation of its own ventilation plan sufficient to create a property interest under the Due Process Clause.

> **2.      EVEN IF PLAINTIFFS HAVE ADEQUATELY PLEADED THE DEPRIVATION OF ANY PROPERTY INTEREST, THEY FAIL TO PLEAD ALLEGATIONS SUGGESTING THEY HAVE NOT RECEIVED DUE PROCESS.**

If the Court concludes that Plaintiffs have adequately pleaded the deprivation of a protected property interest – and it should not – it next must determine whether the available administrative review procedures here "comport with due process."  Sullivan, 526 U.S. at 59.  Application of the Mathews v. Eldridge balancing factors – (1) the significance of the private party's protected interest, (2) the government's interest, and (3) the risk of erroneous deprivation and the probable value, if any, of additional or substitute procedural safeguards – reveals that the administrative review procedures satisfy any Due Process concerns.  Thunder Basin, 510 U.S. at 216-18.

Despite all of the Complaint's bare assertions of bad faith, unreasonableness, and untimeliness on the part of Defendants, Plaintiffs fail to explain why they cannot upon their own affirmative request simply trigger a technical violation citation from MSHA and then seek review from the Commission.  The Commission exercises discretionary review over any case involving,

27

inter alia, a "substantial question of law, policy or discretion," 30 U.S.C. § 823(d)(2)(A)(ii)(V), and may review on its own initiative any decision "contrary to law or Commission policy" or in which "a novel question of policy has been presented," id. § 823(d)(2)(B).  If the factual crux of Plaintiffs' concerns is what they allege in conclusory terms in their Complaint – that Defendants have unreasonably "refused to approve" their ventilation plans and rely improperly on a "one-size-fits-all" approach to approving such plans – the Commission should be more than equipped to address such concerns through the normal review process.  Thunder Basin, 510 U.S. at 213-15, 216-18.

Further, to the extent that Plaintiffs have any concerns that they will suffer financial penalties by foregoing compliance with an MSHA-approved ventilation plan while they seek administrative review, the review process addresses such concerns as well.  As the Supreme Court noted in Thunder Basin, 510 U.S. at 218, only the Commission possesses the authority to actually impose civil penalties proposed by the Secretary, id. § 820(i), and it reviews all proposed civil penalties de novo, id.  The Commission is also empowered to grant temporary relief to an operator pending review of most orders, id. § 815(b)(2), and it must expedite such review where necessary, id. § 815(d).

As the Supreme Court in Thunder Basin emphasized on the facts before it, the administrative review provisions of the Mine Act are adequate to protect the Due Process interests of operators.  This Court should reach the same conclusion here despite Plaintiffs' apparent disinterest in availing themselves of those provisions.

**B.    PLAINTIFFS' COUNT FOUR ALLEGATIONS THAT DEFENDANTS ACTED <u>ULTRA VIRES</u> FAIL TO STATE A CLAIM.**

Under certain limited circumstances, the D.C. Circuit permits judicial review when an agency or official acts <u>ultra vires</u>.  <u>Aid Ass'n for Lutherans v. U.S. Postal Serv.</u>, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (citing <u>Chamber of Commerce v. Reich</u>, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996)).  "In other words, the APA's stricture barring judicial review 'to the extent that statutes preclude judicial review . . . does not repeal the review of <u>ultra vires</u> actions that was recognized long before . . . When an executive acts <u>ultra vires</u>, courts are normally available to reestablish the limits on his authority."  <u>Id.</u> (quoting <u>Dart v. United States</u>, 848 F.2d 217, 221 (D.C. Cir. 1988)).   The actions of which Plaintiffs complain do not fall within these circumstances.

To state an <u>ultra vires</u> claim, it is not enough to allege that an agency or official acted illegally.  Rather, an <u>ultra vires</u> claim rests on "the officer's lack of delegated power."  <u>Larson v. Domestic & Foreign Commerce Corp.</u>, 337 U.S. 682, 690 (1949); <u>see also</u> <u>Dugan v. Rank</u>, 372 U.S. 609, 620 (1963).  Accordingly, "a claim of error in the exercise of that power is therefore not sufficient."  <u>Id.</u>  Thus, an officer "may be said to act <u>ultra vires</u> only when he acts without any authority whatever."  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 101 n.11 (1984) (emphasis added) (internal quotations omitted).

Here, Plaintiffs utterly fail to allege how Defendants might have acted "without any authority whatsoever."  In part, that is because Plaintiffs have failed to plead any factual matter even suggestive of any error on Defendants' part, much less suggestive that Defendants might have acted entirely outside their statutory authority as required to state an <u>ultra vires</u> claim.  As noted <u>supra</u>, Plaintiffs have failed to allege when they submitted proposed ventilation plans or

29

revisions, or how long such proposals had been under review by MSHA before Plaintiffs filed

this action.  More to the point here, Plaintiffs have likewise failed to allege that any Defendant

took any action not permitted by the Mine Act or MSHA's implementing regulations and thus

acted without any authority with respect to their proposals.  Without such alleged factual

material, it is impossible to conclude that Plaintiffs have pleaded facts that suggest even the

"mere possibility" of an ultra vires claim.  See Iqbal, 129 S. Ct. at 1949.  "Where a complaint

pleads facts that are 'merely consistent with' a defendant's liability, it "stops short of the line

between possibility and plausibility of "entitlement to relief."'"  Id. (quoting Twombly, 550 U.S.

at 557).

        Plaintiffs' lack of specific factual allegations undo their ultra vires claims against

Defendants Stricklin, Page, and Hardman for a similar but independent reason.  Ordinarily, a suit

against a federal officer in his official capacity is a suit against the United States.  Larson, 337

U.S. at 695.  However, Larson recognized the possibility of a narrow exception to this principle

where a federal officer has acted wholly beyond the scope of his authority.  Id. at 690.  The logic

behind this exception was that such an errant officer could be presumed to be acting on his own

behalf rather than on behalf of the sovereign, and that courts could presume that Congress – not

having directly addressed this issue – would not seek to preserve that officer's immunity from a

suit to restrain him from mischief.  Id. at 689-95, 702.  But Plaintiffs allege no factual material

that would suggest that Defendants Stricklin, Page, or Hardman were not acting on behalf of

MSHA, and by extension the sovereign.  Indeed, with no specific allegations of fact whatsoever,

it is impossible to reasonably construe Plaintiffs' Complaint as asserting that these Defendants

have taken any action relevant to Plaintiffs' claims whatsoever.  Irrespective of its other faults,

the Complaint thus states no <u>ultra</u> <u>vires</u> claim against these Defendants.

The same conclusion applies to Plaintiffs' individual-capacity claims against Defendants Stricklin, Page, and Hardin.  Although Plaintiffs name these Defendants in both their official and individual capacities, Compl. ¶¶ 20-22, they subsequently abandon any suggestion of individual-capacity liability on their part by seeking only declaratory and injunctive relief." <u>See</u> <u>Hatfill</u>, 519 F. Supp. 2d at 26-27 (citing cases).

As noted above, Plaintiffs' factual allegations are vague to the point of intangibility, and make it difficult to fathom exactly what they are challenging.  But even construed generously, it cannot be said that their Complaint alleges anything beyond the suggestion that Defendants acted in error.  And that is not enough to state an <u>ultra</u> <u>vires</u> claim.  This <u>ultra</u> <u>vires</u> claim should thus be dismissed as to all Defendants in each and every capacity in which they are sued.

**C.  PLAINTIFFS' COUNT SIX ALLEGATIONS THAT DEFENDANTS VIOLATED THE APA FAIL TO STATE A CLAIM.**

Insofar as it is even possible to tell what Plaintiffs allege as a factual matter, it is nonetheless clear that their Complaint fails to state a claim under the APA.  It would appear that Count Six, the alleged violation of the APA, is a mirror image of Plaintiffs' <u>ultra</u> <u>vires</u> claim.  It likewise must be dismissed.

The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.  The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  To be "final," an agency action must "mark the consummation of the agency's

31

decision-making process, and must either determine rights or obligations or occasion legal consequences." Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 482 (2004); see also Bennet v. Spear, 520 U.S. 154, 178 (1997).

The Court cannot review Plaintiffs' claims under the APA because Plaintiffs fail to identify any discrete agency action that the Court is asked to review.  "A sure sign that a complaint fails the 'final agency action' requirement is when 'it is not at all clear what agency action [plaintiff] purports to challenge.'" Friends of the Earth, Bluewater Network Div., v. U.S. Dep't of Interior, 478 F. Supp. 2d 11, 25 (D.D.C. 2007) (quoting Indep. Petrol. Ass'n of America v. Babbitt, 235 F.3d 588, 595 (D.C. Cir. 2001)).  "A plaintiff 'must direct its attack against some particular "agency action" that causes it harm,' because if a court does not limit its review to 'discrete' agency actions, it risks embarking on the kind of wholesale, programmatic review of general agency conduct for which courts are ill-suited, and for which they lack authority." Id. (quoting Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 891 (1990)).

Plaintiffs' allegations of fact, such as they are, abdicate any intent to identify any particular agency action.  Instead, Plaintiffs merely allege that Defendants "have repeatedly and systematically refused to consider the conditions and mining systems of the Plaintiffs' mines" in prohibiting the use of scrubbers and "blowing" ventilation controls, mandating the use of "certain artificial ventilation controls," and requiring Plaintiffs to use mine examiners to evaluate the effectiveness of bleeder entries.  Compl. ¶ 86.  To the extent there are any actual decisions with which Plaintiffs take exception, each such decision would have been "based on different competing factors and considerations." Friends of the Earth, 478 F. Supp. 2d at 25.  Plaintiffs do not point to any in particular that they allege to have imposed adverse consequences on them;

instead the Court is asked to adjudicate the validity of an unspecified number of alleged decisions (or, perhaps, non-decisions) entirely in the abstract. That is outside the authority of this or any other federal court: "The federal courts are not authorized to review agency policy choices in the abstract." Fund for Animals v. U.S. Bureau of Land Management, 460 F.3d 13, 18 (D.C. Cir. 2006). And even if Plaintiffs seek to challenge a "completed universe of orders or regulations," Nat'l Wildlife Fed., 497 U.S. at 890, "the Court must be pointed in the direction of that universe." Friends of the Earth, 478 F. Supp. 2d at 25-26. A court "has to know what is being challenged," id. at 26, and this Court cannot know that on the basis of the factual material alleged here.

"Agency action" is a defined term. See 5 U.S.C. § 551(13). The definition includes several concepts, but it is "not so all encompassing as to authorize [courts] to exercise judicial review over everything done by an administrative agency." Fund of Animals, 460 F.3d at 19. That limitation is essential to the operation of the executive branch:

> Much of what an agency does is in anticipation of agency action. Agencies prepare proposals, conduct studies, meet with members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs.

Id. at 19-20. Reviewing "what an agency does in anticipation of agency action" would "wreak havoc with the normal operations of agencies and the executive branch." Id. at 20 (explaining that an agency's budget proposal is not subject to APA review). There is no suggestion in the Complaint that whatever unspecified conduct with which Plaintiffs take issue constitutes anything more than what MSHA does "in anticipation of agency action."

In summary, Plaintiffs make no allegations that would suggest a violation of the APA.

33

Indeed, they fail to plead anything resembling a final agency action reviewable under the APA in the first instance.  Plaintiffs' Count Six should thus be dismissed.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Complaint must be dismissed for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), or in the alternative, for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: August 24, 2010                                    Respectfully submitted,

                                                          TONY WEST
                                                          Assistant Attorney General

                                                          RONALD C. MACHEN JR.
                                                          United States Attorney

                                                          JUDRY L. SUBAR
                                                          Assistant Branch Director

                                                           _/s/ Christopher R. Hall_____
                                                          CHRISTOPHER R. HALL
                                                          U.S. Department of Justice
                                                          Civil Division
                                                          Federal Programs Branch
                                                          P.O. Box 883
                                                          Washington, D.C.  20530
                                                          (202) 514-4778