IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELK RUN COAL COMPANY, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 10-01056-RJL |
| v. | ) ) | |
| U.S. DEPARTMENT OF LABOR, *et al.*, | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Timothy M. Biddle, D.C. Bar #89284
Thomas C. Means, D.C. Bar #254318
Daniel W. Wolff, D.C. Bar #486733
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-624-2500 (phone)
202-628-5116 (fax)
tbiddle@crowell.com
tmeans@crowell.com
dwolff@crowell.com

Attorneys for Plaintiffs

Dated:  September 21, 2010

## TABLE OF CONTENTS

**Page No.**

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................ 2

I.      AVENUES FOR DISPUTE RESOLUTION UNDER THE MINE ACT ........................ 2

II.     PLAINTIFFS' CLAIMS ....................................................................... 6

ARGUMENT ................................................................................................ 9

I.      THE COURT HAS JURISDICTION TO HEAR THIS CASE. ........................................ 9

        A.      The Supreme Court Recognizes The Right To Bring Original Actions In
                Federal District Court Where The Claims Are Wholly Collateral To An
                Administrative Review Scheme Created By Statute. ........................................... 11

        B.      Plaintiffs' Claims Are Wholly Collateral To The Commission's Review,
                Like The Claims Raised In *McNary*. ................................................. 16

                1.      Plaintiffs' Claims Are Not Within the Commission's Authority. ........ 16

                2.      The So-Called "Technical Violation" Dispute-Resolution
                        Process Referenced By MSHA Is a Fiction and Cannot Provide
                        Meaningful Relief. ...................................................... 23

II.     THE COMPLAINT STATES A CLAIM. ....................................................... 30

        A.      Standard Of Review. ..................................................................... 31

        B.      The Complaint States A Claim Under The Due Process Clause Of The
                Fifth Amendment. ......................................................................... 32

                1.      Plaintiffs Have Identified Protected Property Interests. ...................... 33

                2.      Plaintiffs Have Alleged a Deprivation of Their Protected
                        Interests. ............................................................. 37

                3.      Plaintiffs Have Alleged a Denial of Due Process. ............................... 41

        C.      The Complaint States Claims For *Ultra Vires* Conduct And Under The
                APA. ...................................................................................... 41

                1.      An *Ultra Vires* Conduct Claim Has Been Stated. ................................. 42

      2.        An APA Claim Has Been Stated. ......................................................... 43

CONCLUSION ......................................................................................................................... 45

## INTRODUCTION

Plaintiffs' Complaint is straightforward: they have been aggrieved by the conduct of Defendants Mine Safety and Health Administration ("MSHA") and several MSHA officials (collectively, "MSHA") because MSHA denied Plaintiffs, all underground coal mine operators, their right to ventilate their respective mines consistent with prudent mining engineering and safety and health practices suitable to the conditions and mining systems at their respective mines.  Plaintiffs seek relief in this Court on the alternative theories that, either: (1) Section 303(o) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 863(o) ("Mine Act") deprives Plaintiffs of property and liberty interests without due process of law as guaranteed by the Fifth Amendment; or, (2) MSHA itself, in its execution of the Mine Act, deprives Plaintiffs of property and liberty interests without due process.  Furthermore, because no lawful grant of regulatory authority could empower federal agency officials to act in derogation of the Constitution, the actions taken by MSHA must also be viewed as *ultra vires*.  Finally, and for the same reasons, the discrete actions taken to deny Plaintiffs of property and liberty interests without due process are final actions that are subject to this Court's scrutiny under the Administrative Procedure Act, § 701, *et seq.* ("APA").

MSHA would have this Court believe that all of this is nonsense; that the proper forum for Plaintiffs to air their grievances is the Federal Mine Safety and Health Review Commission ("Commission"); or that, alternatively, Plaintiffs' grievances are too vague to comprehend.  Regarding the Commission, MSHA asserts that, if they wanted to, Plaintiffs could "simply trigger" Commission review upon "their own affirmative request."  Mot. at 27.  If it were only so.

In truth, what MSHA portrays is a fictionalized Commission-review procedure.  Indeed, even if MSHA were willing to stand behind its argument and thus stipulate that it is MSHA's

official position that: (i) upon mere "affirmative request" a mine operator may obtain review of a plan-related grievance before the Commission; (ii) the Commission has jurisdiction to hear such disputes; and (iii) it is "patently" and "plainly" within the *Commission's* authority (as compared to MSHA's) to decide *de novo* all questions going to the merits of a suitable mine plan, there would still be one insurmountable shortcoming to MSHA's argument: *the law is to the contrary*. The Mine Act depicted in MSHA's motion is a fiction; it is a fantasy version of the Mine Act that does not actually exist.  Unfortunately, the real Mine Act does not afford mine operators the generous administrative review process described in MSHA's brief.

As for the adequacy of the pleadings, suffice it that MSHA's summary of Plaintiffs' claims (Mot. at 8-9, 16) belies its premise that it does not understand the claims as pled.

For the reasons explained more fully below, this Court should find that the claims as pled in the Complaint are not reviewable by the Commission, and that nothing precludes this Court's subject-matter jurisdiction over them.  Furthermore, the Complaint states claims upon which this Court can grant relief.  Accordingly, MSHA's motion should be denied and Plaintiffs allowed to pursue their claims.

## **BACKGROUND**

Additional background is provided here to correct or complete that provided by MSHA.

## I.     **AVENUES FOR DISPUTE RESOLUTION UNDER THE MINE ACT**

**A. *Mandatory Standards*.**  When enacted, the Mine Act contained self-executing "interim mandatory standards" for health and safety in underground coal mine operators that had been carried over from the Federal Coal Mine Health and Safety Act of 1969.  *See* 30 U.S.C. §§ 841-846 (health), §§ 861-878 (safety).  MSHA is the agency created and empowered to enforce the Mine Act and its mandatory standards.  *See* 29 U.S.C. § 557a; 30 U.S.C. § 961. Pursuant to Section 101(a) of the Mine Act, Congress also authorized MSHA to develop and

promulgate "improved" mandatory standards as necessary.  *See* 30 U.S.C. § 811(a).  The Section

101(a) rulemaking process typically involves empanelling an advisory committee to make

recommendations and requires MSHA to adhere to "stringent" notice-and-comment rulemaking

requirements.  *See id.*; *Int'l Union, United Mine Workers of Am. v. MSHA*, 407 F.3d 1250, 1259

(D.C. Cir. 2005).  Upon promulgation, an aggrieved party can seek judicial review of such

mandatory standards in the appropriate federal court of appeals.  *See* 30 U.S.C. § 811(d).

Appeals court jurisdiction is exclusive, *i.e.*, mandatory standards cannot be challenged at the

Commission.  *See Drummond Co., Inc.*,  14 FMSHRC 661, 673 (May 1992).

   **B. *Enforcement Actions***.  MSHA enforces the Mine Act and its mandatory standards by

citing operators or issuing orders when, in the opinion of an MSHA inspector, the operator has

violated either the Mine Act or a standard.  *See generally* 30 U.S.C. § 814.  Every alleged

violation is then assessed a civil penalty by MSHA.  *See id.* §§ 815, 820.  The operator, in turn,

may contest, before the Commission, the alleged fact of violation, the MSHA penalty

assessment, and any of the inspector's findings that bears on the penalty assessment.  *See id.*

§ 815(a), (d).[1]  The Commission is independent of the Labor Department.  It is composed of the

five-member Commission itself and a corps of administrative law judges who hear *enforcement*

disputes in the first instance, subject to discretionary review by the Commission and appellate

review by the appropriate federal court of appeals.  *See id.* §§ 816, 823(d).

---

[1] Operators can contest "the issuance or modification of an order issued under section 814 . . ., or citation or a notification of proposed assessment of a penalty issued under subsection (a) or (b) of this section, or the reasonableness of the length of abatement time fixed in a citation or modification thereof issued under section 814 . . . ."  30 U.S.C. § 815(d).  The Commission is also authorized to hear miners' challenges to certain enforcement actions, *see id.*, and miners' complaints of discrimination or for compensation due as a result of an ordered mine closure.  *See id.* §§ 815(c), 821.

      **C.** ***Mine Plan Development and Implementation.***  As enacted in 1977, the Mine Act

required two key types of mine plans: roof control (*id.* § 862(a)) and ventilation (*id.* § 863(o)).

Under both provisions, the operator is required to adopt a plan suitable to the mine's conditions

and method of mining, and to implement and obey the plan following its approval by MSHA.

Mine operators cannot operate their mines without these plans and without MSHA's approval of

these plans – to do so is criminal, punishable by significant fines and prison time.  *See id.*

§ 820(c), (d).  With respect to the ventilation plan, the Mine Act states:

> A ventilation system and methane and dust control plan and revisions thereof
> suitable to the conditions and the mining system of the coal mine and approved by
> the Secretary shall be adopted by the operator and set out in printed form within
> ninety days after the operative date of this subchapter. The plan shall show the
> type and location of mechanical ventilation equipment installed and operated in
> the mine, such additional or improved equipment as the Secretary may require,
> the quantity and velocity of air reaching each working face, and such other
> information as the Secretary may require. Such plan shall be reviewed by the
> operator and the Secretary at least every six months.

30 U.S.C. § 863(o).  To be "suitable," a mine plan (both roof and ventilation) must be developed

in consideration for the conditions as they are known to exist at the mine.  *See United Mine*

*Workers of Am. v. Dole*, 870 F.2d 662, 670 (D.C. Cir. 1989); *Zeigler Coal Co. v. Kleppe*, 536

F.2d 398, 407 (D.C. Cir. 1976).  Once adopted, mine plan provisions are enforced by MSHA as

mandatory standards.  *See Dole*, 870 F.2d at 667 n.7; *Zeigler*, 536 F.2d at 409.

      The courts have construed the Mine Act ventilation and roof control plan provisions to

require MSHA and operators alike to negotiate plans in good faith, *see*, *e.g.*, *Dole*, 870 F.2d at

667, but – importantly – the statute is silent on what the parties are to do in the event they do not

agree on the contents of the plan.  Moreover, the Mine Act is silent on what to do if MSHA acts

arbitrarily in the process, such as failing to act on a proposed plan, or refusing to approve a plan

based on an inflexible "policy" preference regardless of what would be objectively "suitable" for the given mine.

By contrast, in 2006, Congress mandated a new type of plan, the particulars of which it gave far greater consideration. In an amendment to the Mine Act named the Mine Improvement and New Emergency Response Act of 2006, or MINER Act, 120 Stat. 493 (2006), Congress created a new type of plan: the Emergency Response Plan, or ERP. *See* 30 U.S.C. § 876(b)(2). ERPs, like roof control and ventilation plans, require MSHA approval. *See id.* § 876(b)(2)(C). But, significantly, unlike with roof control and ventilation plans, Congress specifically provided for the resolution of disputes stemming from the ERP approval process. *See id.* § 876(b)(2)(G). That provision states:

> **(G) Plan dispute resolution**
>
> **(i) IN GENERAL.** Any dispute between the Secretary and an operator with respect to the content of the operator's plan or any refusal by the Secretary to approve ***such a plan shall be resolved on an expedited basis***.
>
> **(ii) DISPUTES. *In the event of a dispute or refusal*** described in clause (i), the Secretary shall issue a citation which shall be immediately referred to a Commission Administrative Law Judge. The Secretary and the operator shall submit all relevant material regarding the dispute to the Administrative Law Judge within 15 days of the date of the referral. The Administrative Law Judge shall render his or her decision with respect to ***the plan content dispute*** within 15 days of the receipt of the submission.
>
> **(iii) FURTHER APPEALS.** A party adversely affected by a decision under clause (ii) may pursue all further available appeal rights with respect to the citation involved, except that inclusion of the disputed provision in the plan will not be limited by such appeal unless such relief is requested by the operator and permitted by the Administrative Law Judge.

*Id.* (emphasis added).

There are several aspects of this provision of which the Court should take special note. The first, of course, is its very existence, which stands in stark contrast to the lack of any such

dispute-resolution provision for ventilation (and roof control) plans. The second is what it authorizes the Commission to decide: "*the plan content*." 30 U.S.C. § 876(b)(2)(G)(ii). In other words, Congress broke new ground in the MINER Act by authorizing the Commission to adjudicate the ERP *content* itself, not just whether the operator had in fact mined without an approved plan. The third important aspect of this provision is the triggering event: MSHA is directed to issue the citation "in the event of a *dispute or refusal* [by MSHA to approve the plan]," not a "violation." This means that the operator is not required to violate the law in order to have its objections heard by the Commission. Finally, the provision guarantees the right to an *expedited* hearing, giving the operator some assurance of quick relief.

Obviously, then, Congress recognizes (at least the 109th Congress recognized) that disputes may occur in the plan negotiation and approval process that cry out for adjudication (expedited adjudication at that). To date, however, Congress has only crafted a dispute-resolution process for one type of plan, the ERP. There remains no remedy for ventilation and roof control plan disputes.

## II.    PLAINTIFFS' CLAIMS

**A. *General Nature of the Dispute.*** Plaintiffs' Complaint pleads claims that do not fall within the statutorily created review or dispute-resolution pathways noted above. This is because the claims are not "pre-enforcement"; they arise entirely outside of the enforcement scheme.

At the root of all of the claims is MSHA's demand that Plaintiffs, under penalty of mine closure for failure to have an approved ventilation plan, include or omit certain provisions in their ventilation plans, and the fact that it is doing so in a manner that is arbitrary and capricious and not in good faith. MSHA's conduct is arbitrary and unlawful because the agency is acting on the basis of inflexible and subjective beliefs regarding how Plaintiffs should ventilate their mines, without considering the individual characteristics of those mines, and thus without

considering whether its demands on Plaintiffs in developing and implementing their respective ventilation plans are "suitable" to the conditions and mining system at each mine. *See* 30 U.S.C. § 863(o) (requiring ventilation plan to be suitable to the mine).

This suit has been brought because ventilation plans are crucial to the operation of Plaintiffs' mines. When MSHA does not deal with Plaintiffs squarely, Plaintiffs' mines are in jeopardy: without MSHA's approval of their ventilation plans, the mines cannot operate. If MSHA were omniscient and infallible, perhaps this would all be immaterial, but of course MSHA is composed of humans, and thus "only human" in its functioning: it is fallible, frequently so, and as the Complaint alleges, MSHA's decisions are not always rational, much less in the best interest of the health and safety of Plaintiffs' miners. *E.g.*, Compl. ¶ 54.

The problem is compounded because the so-called "plan approval" process is not as straightforward as MSHA's Motion depicts. MSHA frequently requires plan amendments, revisions, or addenda based on any number of considerations, sometimes legitimate, sometimes not. Whatever the case, decisions are made, directives are given, and this process frequently unfolds over the phone, in person at the MSHA district office, or over a series of calls or meetings. And while the approval as to the final plan as a whole is given in writing, many of the intermediate decisions – up or down decisions that have final consequences in their own right, such as the removal of a proposed provision – are not. It is a coercive process because jobs are in the balance and coal sale contracts are at stake if an operator does not adopt (or drop) a plan provision as MSHA may demand. None of this is lost on MSHA. *See* Compl. ¶ 43. MSHA knows it has leverage: it is simply a matter of the operator submitting to MSHA's will or having its mine shut down.

Unfortunately, the Mine Act provides no recourse in the event of a disagreement, which is why most disagreements usually end quickly with MSHA getting its way.  Importantly, these are *not enforcement* situations; they do not involve citations.  There is nothing to contest before the Commission.  MSHA is not in a hurry.  As MSHA acknowledges (Mot. at 5), MSHA is not mandated to act on a plan within a certain period of time.  Plaintiffs are not so lucky.  They have employees, they have contracts requiring them to supply coal to their customers, they have shareholders – these are the existential issues they must consider whenever MSHA tells them what it wants in their ventilation plans before it will give its approval.

In short, the ventilation plan development and approval process is broken.[2]  This dysfunction in the ventilation plan process created by Congress has existed since the law's passage, but has become intolerable over the last few years as a result of MSHA's unchecked arrogance.  This lawsuit is Plaintiffs' only current avenue for relief.

**B. *Specific Claims***.  The thrust of Count I is that by failing to provide recourse for breakdowns or arbitrary treatment by MSHA in the development and approval of ventilation plans, and given the fundamental importance of ventilation plans to the operation of Plaintiffs' mines, the Mine Act inherently sets up Plaintiffs for a deprivation of property and liberty interests, including those specified in the Complaint, without due process of law.  Count III is essentially an alternative to Count I, alleging that, even were the Court to find that the "good faith" negotiation process envisioned by the Mine Act for the approval of ventilation plans passes constitutional muster, at the very least the lack of good faith in that process by MSHA – *i.e.*, the agency's inflexible application of its subjective norms without consideration of the individual conditions of each mine – effects a deprivation of property and liberty interests

---

[2] This is not hyperbole.  As we highlight below (*infra* at page 29), the Court may take judicial notice of language in a bill pending before Congress that speaks to this issue.

without due process of law.  Count V claims that because there could never be a valid reason for MSHA to deprive Plaintiffs of their property and liberty interests in the manner it has, MSHA's actions violate substantive due process principles (*i.e.*, there is no rational basis for their actions). Counts II and VII are derivative of Counts I and Counts III and V, respectively, and seek declaratory relief to affirm Plaintiffs' rights under the Fifth Amendment.

The premise of Count IV is that, in depriving Plaintiffs of the right to ventilate their respective mines consistent with prudent mining engineering and safety and health practices suitable to the conditions and mining systems at their respective mines, MSHA could not have been acting within the lawful scope of its delegated authority, and thus was acting *ultra vires*.  If the Mine Act itself is to be construed as constitutional, then it cannot simultaneously be construed so as to permit MSHA to act in a manner that violates Plaintiffs' constitutionally protected rights.

The premise of Count VI, an alternative to Count IV, is that each action by which MSHA denied Plaintiffs the right to ventilate their respective mines consistent with prudent mining engineering and safety and health practices suitable to the conditions and mining systems at their respective mines, as the Mine Act requires, *see* 30 U.S.C. § 863(o), was a final agency action with respect to the affected mine.  As such, the lawfulness of each such action is reviewable under the APA.  *See* 5 U.S.C. §§ 704, 706.

## ARGUMENT

## I.  THE COURT HAS JURISDICTION TO HEAR THIS CASE.

Plaintiffs are well aware of the rights they have under the Mine Act to contest *enforcement* actions before the Commission.  And, as the Complaint makes plain, Plaintiffs are also not naive about the inability to seek redress in federal district court for what are, at bottom,

*enforcement*-centered disputes.  *See* Compl. ¶ 7.[3]  Plaintiffs come to this Court because, in

substance and as pled, their claims are not justiciable at the Commission, and if this Court cannot

hear their claims, they will be denied meaningful relief because there is no other forum that can

provide relief.

MSHA's reliance on *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), for the

opposing proposition is unfounded.  As an initial matter, *Thunder Basin* actually supports the

Court's jurisdiction over the Complaint: not only was the Supreme Court careful to limit its

holding to the type of claims at issue in that case, *see* 510 U.S. at 207 ("[W]e conclude that the

Mine Act precludes district court jurisdiction over the pre-enforcement challenge *made here*.")

(emphasis added); *id*. at 208 ("The structure of the Mine Act … demonstrates that Congress

intended to preclude challenges *such as the present one*.") (emphasis added)*,* but it also

emphasized that district court jurisdiction would lie over claims "wholly collateral" to the Mine

Act's statutory review scheme.  *Id*. at 212.  Moreover, the claims pled in this case are materially

different from those in *Thunder Basin*.  That case involved Mine Act provisions that permit

miners to choose representatives to accompany MSHA inspectors and mine management on

mine inspections, and an MSHA regulation that requires operators to post at the mine identifying

information about any miner representative.  *See* 30 U.S.C. § 813(f); 30 C.F.R. § 40.4.  The

operator in *Thunder Basin* objected to the designated representatives, refused to post the required

information, and, knowing a citation was forthcoming from MSHA, moved in district court to

---

[3] Contrary to MSHA's contention that the Plaintiffs were "so defensive" about *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), that they went "out of their way to argue" about its inapplicability in the jurisdictional section of the Complaint (Mot. at 2), the reference was provided per Plaintiffs' obligation to inform this Court of the basis for its jurisdiction.  *See* Fed. R. Civ. P. 8(a)(1).  Furthermore, far from "utterly fail[ing]" to acknowledge Commission-review procedures (Mot. at 19), the Plaintiffs did acknowledge them, and noted they did not apply. Compl. ¶ 42.

enjoin MSHA from citing it, essentially trying to preempt the enforcement action that it knew was coming.  510 U.S. at 205-06.  Here, in contrast, Plaintiffs have not violated the Mine Act, so there is no basis for an enforcement action or Commission review thereof.

That is the rub of the case: Plaintiffs' grievances stem from agency misconduct unforeseen by Congress and for which the Mine Act therefore failed to provide relief, ever, which is why this case, as distinguished from *Thunder Basin*, cannot be characterized as "pre-enforcement" – *enforcement*, and Plaintiffs' consequent opportunity to contest such enforcement, will never come to pass.  The only forum in which Plaintiffs can find relief from MSHA's conduct is this Court.

Not all claims dealing in the subject matter of the Mine Act are *enforcement* disputes that fall within the expertise of the Commission.  Some claims, while perhaps touching on the same subject matter by virtue of the context in which the dispute arises, are "wholly collateral" to the statutory scheme and outside the Commission's authority.  *See*, *e.g.*, *Int'l Union, UMWA v. Martin*, 785 F. Supp. 1025 (D.D.C. 1992).  Where a plaintiff raises such claims, district court jurisdiction will lie; to hold otherwise would be to foreclose all meaningful judicial review.  *See Thunder Basin*, 510 U.S. at 212.  We turn next, therefore, to an examination of what it means to be "wholly collateral" to a statutory review scheme, and then explain why the claims asserted by Plaintiffs are "wholly collateral" to the Commission review scheme under the Mine Act and thus outside of the Commission's expertise.

### A.     The Supreme Court Recognizes The Right To Bring Original Actions In Federal District Court Where The Claims Are Wholly Collateral To An Administrative Review Scheme Created By Statute.

At the outset, it is important to stress that *Thunder Basin* does not sit in a vacuum.  The starting point for analysis is the deeply rooted presumption that federal court jurisdiction will lie unless there is "'clear and convincing evidence' of a contrary legislative intent."  *See Traynor v.*

*Turnage*, 485 U.S. 535, 542 (1988) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)).

Illustrative of this principle, not cited by MSHA, is the Supreme Court's most recent decision

addressing "wholly collateral" claims, *Free Enterprise Fund v. Public Company Accounting*

*Oversight Board*, 130 S. Ct. 3138 (2010).  As MSHA does here, the U.S. claimed in *Free*

*Enterprise* that the district court lacked jurisdiction, and that the plaintiff was required to draw an

administrative sanction in order to press its constitutional claims through the statutory

administrative adjudication process.  *See id.* at 3150-51.  The Supreme Court, relying on, and

distinguishing in important respects, *Thunder Basin*, rejected the U.S.'s argument.

The central question in *Free Enterprise* was whether the Public Company Accounting

Oversight Board ("the Board") created in the Sarbanes-Oxley Act of 2002, 116 Stat. 745, was

constitutional.  The Board – composed of five members appointed by the Securities and

Exchange Commission ("SEC") – was empowered to enforce Sarbanes-Oxley and all related

rules and standards, including the rules of the SEC, subject to SEC oversight.  *See Free*

*Enterprise*, 130 S. Ct. at 3147-48 (citing relevant statutory provisions).  Sarbanes-Oxley

empowers the SEC to review any Board rule or sanction, *see id.* at 3150, while any rule or final

order of the Commission is itself subject to review in a court of appeals.  *See id.* (citing 15

U.S.C. § 78y(a)(1), (b)(1), (c)(1)).  The plaintiff sought a declaratory judgment that the Board

was unconstitutional.  Before deciding the merits, the lower courts were called upon to determine

whether the case was even justiciable, given the administrative review scheme of 15 U.S.C.

§ 78y.  *See id.* at 3149.  The lower courts held the case was justiciable, and the Supreme Court

agreed.  *See id.* at 3149-50.

Frequently referencing *Thunder Basin* – in light of the U.S.'s heavy reliance on it in

gainsaying district court jurisdiction – the Supreme Court handily dismissed the U.S.'s argument

12

that the claims were precluded by the Sarbanes-Oxley review scheme.  *See id.* at 3150-51.  The

Court rejected the U.S.'s treatment of § 78y "as an exclusive route to review," saying "the text

does not expressly limit the jurisdiction that other statutes confer on district courts.  *See, e.g.,* 28

U.S.C. §§ 1331, 2201," and neither "does it do so implicitly."   *Id.* at 3150.   Reaffirming the

door it left open in *Thunder Basin*, the Court held that "[p]rovisions for agency review do not

restrict judicial review unless the 'statutory scheme' displays a 'fairly discernible' intent to limit

jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within

th[e] statutory structure.'"  *Id.* (citing *Thunder Basin,* 510 U.S. at 207, 212).  *Accord Johnson v.*

*Robinson*, 415 U.S. 361, 373-74 (1974); *Abbott Labs.*, 387 U.S. at 141 (1967).

     *Free Enterprise* is hardly an outlier.  In addition to *Thunder Basin*, the *Free Enterprise*

Court also relied on another important case that MSHA ignores in its motion, *McNary v. Haitian*

*Refugee Center, Inc.*, 498 U.S. 479 (1991).  *See* 130 S.Ct. at 3150.  In *McNary*, the Court

considered whether a district court had jurisdiction over plaintiffs' challenges to the procedure

by which the Immigration and Naturalization Services ("INS") conducted interviews as part of

its consideration of amnesty claims.  The governing law provides for judicial review of any

deportation order issued by the INS exclusively in the court of appeals, and the U.S. argued that

this review procedure precluded district court jurisdiction over the constitutional claims asserted.

*See McNary*, 498 U.S. at 491-92.  The Supreme Court disagreed, holding that the narrow review

provision for "deportation" decisions did not preclude review of claims stemming from "a

practice or procedure employed in making decisions," as was the focus of plaintiffs' claims.  *Id.*

at 492.  By their nature, plaintiffs' claims were not of the type committed to agency review, and

to hold otherwise would have foreclosed all review of plaintiffs' constitutional concerns.  *See id.*

at 493-97; *accord Bowen v. Mich. Acad. of Family Phys.*, 476 U.S. 667, 675-76 (1986)

(distinguishing "challenges mounted against the *method* by which such amounts are to be determined rather than the *determinations* themselves").

The D.C. Circuit has also distinguished such judicially reviewable collateral claims from those that are barred as particular to the agency review process created by statute. *See Gen. Elec. Co. v. EPA*, 360 F.3d 188 (D.C. Cir. 2004) ("*GE I*"); *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 125-27 (D.C. Cir. 2010) ("*GE II*"). In *General Electric*, Plaintiffs challenged, as Plaintiffs in this case challenge, the constitutionality of both the governing statute and the practice by which the enforcement agency (the Environmental Protection Agency ("EPA")) executed that statutory provision. *See GE I*, 360 F.3d at 191 (challenge to statute); *GE II*, 610 F.3d at 124 (challenge to agency pattern and practice). Specifically, the case concerned the constitutionality of the provision, and EPA's execution of the provision, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), that authorizes EPA to issue unilateral administrative orders ("UAOs"), which, at least as administered, allow EPA to order a party to clean up a contaminated site in certain circumstances without opportunity for a prior hearing. *See* 42 U.S.C. § 9606; *GE I*, 360 F.3d at 190; *GE II*, 610 F.3d at 114-15. Judicial review of a UAO is not authorized until the ordered cleanup is complete or until EPA brings its own action to enforce the UAO. *See* 42 U.S.C. §§ 9606(b)(1), (2), 9613(h). Accordingly, EPA argued that the plaintiff could not directly challenge the statute, or EPA administration of the statute, in federal district court. The D.C. Circuit disagreed.

That statutory prohibition of judicial review, the D.C. Circuit held, did not bar plaintiffs' claims because plaintiffs attacked the constitutionality of the statute itself, *see GE I*, 360 F.3d at 188, and EPA's "pattern and practice" of enforcing the statute. *See GE II*, 610 F.3d at 125. In so ruling, the D.C. Circuit was in good company, for the pedigree of cases recognizing the

14

jurisdiction of the federal district courts over challenges to statutes or agencies' patterns and practices of enforcing those statutes – even where the statutes themselves require administrative review and exhaustion of certain issues in the first instance, followed by limited judicial review – is a venerable one.  *See GE I*, 360 F.3d at 192 (citing cases).

In fact, one of the latest decisions in the pedigree comes from a case recently brought by a mine operator against MSHA in the Southern District of Illinois.  *See American Coal Co. v. MSHA*, No. 08-CV-0814-MJR, 2010 WL 653113 (S.D. Ill. Feb. 19, 2010).  In that case, the operator alleged, *inter alia*, that MSHA had unlawfully imposed a quota on the number of citations that have to be written each hour.  *See id.* at *1.  Because the Mine Act states that a citation shall be written only where an MSHA inspector "believes" the operator has committed a violation, *see* 30 U.S.C. § 814(a), the operator complained that MSHA, by its quota policy, was causing inspectors to issue baseless citations, in violation of the operator's due process rights. *Id.* at *8.  Although the district court dismissed without prejudice the complaint for failure to state a claim,[4] it first addressed, and rejected, the very same jurisdictional argument (as well as a ripeness argument) that MSHA raises here – that *Thunder Basin* bars the suit.  Distinguishing *Thunder Basin*, the court correctly found that the operator was not seeking "preemptive relief" from a forthcoming citation for violating "a health or safety standard, rule, order or regulation," but only "from an agency policy governing agency employee productivity."  *Id.* at *4. Consistent with *McNary* and *General Electric*, *American Coal* correctly recognized the limited reach of *Thunder Basin*'s preclusion principle, and illustrates MSHA's flawed reliance on *Thunder Basin* in this case.

_____

[4] The operator was granted leave to amend, which it did, and MSHA's motion to dismiss that amended complaint is currently pending before the court.  The docket information is available on that court's Pacer site.

**B.**     **Plaintiffs' Claims Are Wholly Collateral To The Commission's Review, Like The Claims Raised In *McNary*.**

The central question raised by MSHA's motion is whether the review process created by Congress in the Mine Act, by which the Commission hears *enforcement* disputes, affords Plaintiffs meaningful review of the *non-enforcement* claims they have raised in this case. *See Thunder Basin*, 510 U.S. at 208. This requires an examination of the types of disputes the Commission is authorized to decide. *See id.* at 212. If the claims pled in the Complaint are not of the type the Commission is authorized to decide, then they are collateral and jurisdiction lies in this Court. *See id.* at 212-13.

As the precedents not cited by MSHA demonstrate, claims attacking the constitutionality of a statutory provision (Compl. Count I; *e.g.*, *Free Enterprise*, *GE I*) or claims attacking the constitutionality of the enforcement agency's conduct (Compl. Counts III and V; *e.g.*, *McNary*, *GE II*) are not generally within the purview of an administrative review body's expertise or authority, and absent evidence of a "clear and convincing" intent of Congress, federal district court jurisdiction over such claims is not precluded. It is a rare statute, after all, that precludes judicial review of its constitutionality – indeed, the very idea raises derivative constitutional concerns. *See Robison*, 415 U.S. at 366 & n.8.

In this case, Plaintiffs' claims are like those pled in *Free Enterprise*, *McNary*, and *General Electric*, among others, and unlike the claims asserted in *Thunder Basin*. Moreover, and unlike in *Thunder Basin*, Plaintiffs have no other forum in which they can obtain meaningful relief – this Court is all they have.

**1.**     **Plaintiffs' Claims Are Not Within the Commission's Authority.**

*Thunder Basin* was an easy case. In the normal course, an operator's refusal to post the contact information of the miners' chosen representatives is a violation of the Mine Act, 30

U.S.C. § 813(f); 30 C.F.R. § 40.4, and thus a citable offense.  Once MSHA issues a citation for

such violation, the operator is free to contest the citation before the Commission, and raise any

defense to liability.  *See id*. § 815(a), (d).   In other words, the operator's conduct in *Thunder*

*Basin* gave rise to a cookie-cutter enforcement action that it could not stymie by filing a

"preemptive strike" in federal court.  *Thunder Basin*, 510 U.S. at 206 (quoting intermediate

appellate decision).  As the Supreme Court explained:

> Had petitioner persisted in its refusal to post the designation, the Secretary would
> have been required to issue a citation and commence enforcement proceedings.
> Nothing in the language and structure of the Act or its legislative history suggests
> that Congress intended to allow mine operators to evade the statutory-review
> process by enjoining the Secretary from commencing enforcement proceedings,
> as petitioner sought to do here.

*Id*. at 216 (internal citations omitted).[5]

Plaintiffs in this case do not have the luxury of Commission review.  As explained in

*Thunder Basin*, the Mine Act "establishes a detailed structure for reviewing [by the Commission]

*violations* of 'any mandatory health or safety standard, rule, order, or regulations promulgated'

under the Act.'"  *Id*. at 207 (emphasis added).  Here, there was no violation, and hence no

citation to contest at the Commission.  Likewise, this Court is not being called upon to resolve

any issues expressly committed to the Commission's jurisdiction – the Mine Act gives the

Commission no voice in the composition of an operator's ventilation plan.  *Compare* 30 U.S.C.

§ 863(o) *with id.* § 876(b)(2)(G).

Approaching the issue from another angle, MSHA posits that because there are only two

situations in which the Mine Act authorizes a federal district court action, Plaintiffs' Complaint

---

[5] For the same reasons, MSHA's reliance on *Sturm, Ruger & Co. v. Chao*, 300 F.3d 867 (D.C.
Cir. 2002), and *Eastern Bridge, LLC v. Chao*, 320 F.3d 84 (1st Cir. 2003), is misplaced because
both of those cases, like *Thunder Basin*, were preemptive strikes on obvious agency enforcement
actions.

is precluded.  *See* Mot. at 7, 14.  But this action is not brought under the Mine Act, so the premise to MSHA's analysis is faulty.  That the Mine Act only positively provides for district court jurisdiction in two situations says nothing about the right of a mine operator to seek relief in federal court pursuant to general federal question jurisdiction (28 U.S.C. § 1331) for conduct that is collateral to the Mine Act.  For example, nobody would dispute an operator's right to bring an action in contract growing out of the purchase of safety and health equipment such as scrubbers or an action in tort growing out of a mine accident, notwithstanding the fact that the *Mine Act* does not provide for any such right of action.  Constitutional claims, APA claims, *ultra vires* claims, and all other claims that are collateral to the Mine Act are no different.

The Supreme Court confronted a similar argument in *McNary*.  There, the Court carefully scrutinized the limitation the governing statute placed on judicial review, and held that the limitation only applied to a specific type of case (*i.e.*, deportation orders).  *See* 498 U.S. at 492.  The narrowness of that judicial-review provision was taken as legislative evidence that Congress did not intend to preclude a broader universe of claims otherwise justiciable in federal district court, not vice versa as the U.S. argued.  *See id*.  The Supreme Court reiterated this principle in *Free Enterprise*, rejecting the U.S.'s argument that the administrative review process established by Sarbanes-Oxley was "an exclusive route to review," stating that "the text does not expressly limit the jurisdiction that other statutes confer on district courts.  *See*, *e.g.,* 28 U.S.C. §§ 1331, 2201."  130 S.Ct. at 3150.  And the D.C. Circuit reached the same conclusion in *GE I*, expressly relying on *McNary*.  There, confronted with whether the CERCLA preclusion of "any challenges" to UAOs prior to completion of the ordered cleanup or an EPA enforcement action (to enforce the UAO) meant that the plaintiff could not challenge the constitutionality of the UAO statutory provision itself, the court of appeals said "no" – the preclusion only extended to

any challenges to the merits of the ordered cleanup, not any challenges brought on other grounds, including to the statute itself.  *See GE I*, 360 F.3d at 191.  *Cf. Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (holding that the lack of a statutory cause of action is not *per se* a bar to judicial review).

*Free Enterprise* puts to rest MSHA's contention that the Court lacks jurisdiction to hear Plaintiffs' claims.  It shows that just the opposite is true, confirming what *Thunder Basin* clearly implied, to wit, that independent constitutional questions are generally not within the Commission's expertise.  *Free Enterprise*, 130 S.Ct. at 3151.  That the constitutional and non-Mine Act statutory claims pled in *Thunder Basin* were also deemed subject to Commission review does not alter the analysis.  The *Thunder Basin* Court did not say the Commission has expertise over constitutional claims – it said just the opposite.  *See* 510 U.S. at 215 (stating that constitutional claims are not typically within the expertise of agencies).  The Court only directed that those claims be heard in the first instance by the Commission because that case was, at bottom, an *enforcement* case which was within the Commission's exclusive jurisdiction.  *In that context*, it made sense to permit the Commission to pass on the claims first, recognizing that the operator at least had the backstop of secondary review in a federal court of appeals.  *See id.* Indeed, the Supreme Court made this very point in *Free Enterprise*, holding that the plaintiff's constitutional claims in that case were "outside the [SEC's] competence and expertise," and rejecting the comparison to *Thunder Basin* on the ground that

> the petitioner's primary claims [in *Thunder Basin*] were statutory; "at root ... [they] ar[o]se under the Mine Act and f[e]ll squarely within the [agency's] expertise," given that the agency had "extensive experience" on the issue and had "recently addressed the precise ... claims presented."

*Id.* at 3151 (quoting *Thunder Basin*, 510 U.S. at 214-15) (alterations in original); *cf. Heckler v. Ringer*, 466 U.S. 602, 614 (1984) (explaining that claims "inextricably intertwined" with claims

committed to administrative review could be reviewed in the first instance under an administrative review scheme).

Likewise, *Thunder Basin*'s concern with the ability of operators to frustrate the Commission review process if they could preempt Commission review by seeking an injunction in federal court is not a concern here. *See Thunder Basin*, 510 U.S. at 216. In *Thunder Basin*, the Court explained that Congress designed the Mine Act enforcement and administrative review procedures to allow for improved collection of civil penalties and the "rapid abatement of violations ... for the protection of miners." *Thunder Basin*, 510 U.S. at 211 (citing S. Rep. No. 95-181, at 30 (1977), *reprinted in* Subcomm. on Labor of the S. Comm. on Human Res., 95th Cong., Legislative History of the Federal Mine Safety and Health Act of 1977, at 618 (1978)). In other words, Congress was concerned that allowing review in district courts would prolong the authorized penalty and enforcement process and thus "thwart effective enforcement." *Id.* at 210-11. By contrast, because Plaintiffs' claims do not implicate an *enforcement* situation, this lawsuit will not hinder MSHA's enforcement of any particular provision or citation. Nor will it delay MSHA's ability to collect any penalties – there are no penalties, because there has not been any violation. *See, e.g., American Coal*, 2010 WL 653113, at *4 ("Consideration of American Coal's claim by a district court would not frustrate efforts to enforce mine safety laws. It involves no particular citation, so allowing the district court jurisdiction does not threaten to delay enforcement of the Mine Act and MSHA regulations as it did in *Thunder Basin*.").

Indeed, given the rather limited scope of issues the Commission is authorized to hear, this Court's jurisdiction is even broader than that held by the D.C. Circuit to exist in *General Electric* (or, put another way, the preclusive effect of the Mine Act is narrower than the preclusive effect of the CERCLA provision addressed in *General Electric*). In *GE II*, the court of appeals pointed

out that because Plaintiffs were not attacking the merits of any particular UAO but, rather, EPA's policy and practice of enforcing the UAO provision, jurisdiction over the claim lay in the district court. *See GE II*, 610 F.3d at 125. Thus, the D.C. Circuit was following the Supreme Court's rationale in *McNary*, in which the Court held that jurisdiction was proper in the district court because the claim attacked the constitutionality of INS's interview procedures for an amnesty program, not an individual order of deportation which the statute required to be reviewed only by the court of appeals, and only after an order of deportation was actually issued. *See* 498 U.S. at 495.

In this case, the Court can go farther. Not only can it consider Plaintiffs' challenges to the constitutionality of the Mine Act and, alternatively, to MSHA's pattern and practice of administering ventilation plan requirements, but the Court may also review the merits of MSHA's decisions denying Plaintiffs the right to ventilate their mines consistent with prudent mining engineering and safety and health practices suitable to the conditions and mining systems at their respective mines. This is within the Court's jurisdiction because: (1) as explained already, the Commission does not have the authority to pass on the merits of ventilation plan disputes, as it does for ERP disputes or for contests of citations or orders issued by MSHA for violations of the Mine Act and its regulations;[6] and (2) once a ventilation plan is approved, the provisions of that plan become mandatory standards and thus subject to review in the appropriate court of appeals, *as MSHA has acknowledged. See* Mot. at 4; *Dole*, 870 F.2d at 667 & n.7, 670

---

[6] Even in the ERP dispute context, which is expressly authorized by statute, the Commission employs an "arbitrary and capricious" standard of review. *See, e.g., Twentymile Coal Co.*, 30 FMSHRC 736, 748 (Aug. 2008). Addressing an review scheme that used the "abuse-of-discretion" review standard, the Supreme Court held in *McNary* that it "would make no sense" to require constitutional claims to be subject to that type of standard. *See McNary*, 498 U.S. at 493. The same logic would apply to the arbitrary and capricious standard.

21

& n.13.[7]  Given that the Commission lacks jurisdiction over any aspect of Plaintiffs' claims,

challenges to the constitutionality of MSHA's pattern and practice of administering the

ventilation plan requirement, as well as the merits of MSHA's decisions disallowing important

provisions sought by the operator, are justiciable in federal district court.[8]

Finally, MSHA is wrong, both analytically and substantively, to contend (Mot. at 19) that

Plaintiffs cannot avoid *Thunder Basin* by "multiplying their claims" to state an unlawful "pattern

and practice" by MSHA.  First, as an analytical matter, Plaintiffs' claims would be "wholly

collateral" even if the claims of the individual Plaintiffs at their individual mines were pled and

addressed seriatim.  This is because, for the reasons explained above, the claims fall outside the

jurisdiction of the Commission and will never be the subject of an MSHA enforcement action

contestable before the Commission.

Second, as a substantive matter, while a plaintiff need not plead a "pattern and practice"

in order to state a "collateral" claim, the existence of a "pattern and practice" further renders the

claim collateral.  *See McNary*, 498 U.S. at 492 (describing "practice and policy" claims as

"collateral"); GE *II*, 610 F.3d at 126-27 (distinguishing collateral "pattern and practice" claims

---

[7] It has long been settled that the Commission cannot pass on the merits of a mandatory standard – the Mine Act commits review of mandatory standards exclusively to the federal courts of appeals.  *See* 30 U.S.C. § 811(d); *e.g.*, *Drummond*,  14 FMSHRC at 673 ("Section 101(d) clearly vests jurisdiction over challenges to the validity of mandatory safety and health standards exclusively with the United States Courts of Appeals").

[8] Since approved plans constitute mandatory standards, Plaintiffs acknowledge that it is possible, under the rationale articulated by the D.C. Circuit in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 76-78 (D.C. Cir. 1984) ("*TRAC*"), that the court of appeals would hold that the challenges to the merits of MSHA's plan-related decisions – omissions as well as included provisions – are justiciable only in the court of appeals.  The Plaintiffs do not believe *TRAC* controls because it is not directly on point, *accord id.* at 78, and, as *McNary* emphasizes, constitutional claims are better left for the *de novo* fact-finding function of the district courts. *See* 498 U.S. at 493.  Because MSHA did not raise this point, we do not address it further here. We note only that, should this Court determine that jurisdiction over some or all of the claims lies in the court of appeals, the case should be transferred to that court and docketed accordingly. *See* 28 U.S.C. § 1631.

from individualized claims).  Here, the "pattern and practice" as pled is important for two

reasons: (1) it is at the root of each Plaintiff's grievance with MSHA, and would provide a basis

for each Plaintiff to pursue an individual action; and (2) it is the common thread that runs

through each of the Plaintiff's dealings with MSHA, thus prompting Plaintiffs to join in this

Complaint not for the sake of multiplicity but for judicial economy.

>       2.      **The So-Called "Technical Violation" Dispute-Resolution**
>               **Process Referenced By MSHA Is a Fiction and Cannot Provide**
>               **Meaningful Relief.**

MSHA says Plaintiffs can air their grievances at the Commission.  Not true.  It is true, of

course, that Plaintiffs could operate pursuant to a ventilation plan not approved by MSHA and

draw a citation, but in that event, the citation would be written for mining without an approved

plan, in violation of 30 C.F.R. § 75.370.  In such a case, the only issues which the Mine Act

grants the Commission jurisdiction to decide are the fact of violation (*i.e.*, did the operator mine

without an approved plan?)[9] and the calculation of the resulting penalty.  Where an operator

intentionally mines without an approved plan, MSHA will always win the fact-of-violation

contest, and the penalty issue is immaterial to the matter at hand.  The critical point, explained

above, is that there is no statutory authority for the Commission to go beyond the fact of

violation and hear the merits of the operator's *plan dispute*.  *See* 30 U.S.C. §§ 815(a), (d), 823(d).

The Commission has no say-so in the foundational question of whether the standard incorporated

into the ventilation plan is appropriate (as it does with ERPs).

MSHA would have this Court believe otherwise; it would have this Court believe that a

"well-accepted" procedure for bringing the types of claims Plaintiffs raise in this Court for

---

[9] *See, e.g.*, *Jim Walter Resources, Inc.*, 9 FMSHRC 903, 907 (May 1987) ("In plan violation cases the Secretary must establish that the provision allegedly violated is part of the approved and adopted plan and that the cited condition or practice violates the provision.").

review and resolution before the Commission is already in place.  Mot. at 6, 18.  But MSHA's characterization of that procedure being "well-accepted" is akin to the cook saying the soup is delicious.  The truth of the matter is that the procedure is neither authorized by the Mine Act nor well-accepted.  It is a fiction in application, and is cited here by MSHA as a bootstrap to *Thunder Basin*.

On its face, MSHA's argument that Plaintiffs could "simply request" a "technical violation" (Mot. at 18) is proof positive that this case is not like *Thunder Basin*: there, a citation contestable before the Commission would have been forthcoming based on the operator's conduct; there was no need for it to *request* a citation to trigger the requisite administrative litigation.

Moreover, the idea that Plaintiffs must violate the law in order to get their constitutional grievance heard by the Commission was one that was soundly rejected in *Free Enterprise*.  There, as in this case, the U.S. argued that the plaintiff could simply "*incur* a sanction (such as a sizeable fine) by ignoring Board requests for documents and testimony," and thus place itself in a posture of raising its constitutional challenge first before the SEC, and later the court of appeals.  *See id.* at 3150-51 (citing U.S. brief).  The Supreme Court handily rejected that perverse notion, stating in no uncertain terms that the Court generally does not require a plaintiff to commit a "'violative action' before 'testing the validity of the law,'" *id.* (quoting *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 129 (2007)), and that doing so was not a "'meaningful' avenue of relief." *Id.* (quoting *Thunder Basin*, 510 U.S. at 212).

But what stands out most about MSHA's argument that the Commission can hear this dispute is what it does not cite for authority: *the Mine Act*.  Instead, curiously, MSHA points to the legislative history (a Senate report) of another statute, the 2006 MINER Act.  *See* Mot. at 5

24

(citing S. Rep. No. 109-365 (2006)).  There are several significant shortcomings to MSHA's

reliance on this legislative history, and thus to its analysis as a whole.

*First*, the citation to the MINER Act legislative history is misleading because the MINER

Act does not address ventilation (or roof control) plans.  Rather, the MINER Act was concerned

in substantial part with, and in fact created, an entirely new type of plan: the ERP.  *See* MINER

Act § 2(3) (adding 30 U.S.C. § 876(b)).  The MINER Act, and *a fortiori* its legislative history,

sheds no light on the meaning of the Mine Act's ventilation plan provision enacted decades

earlier (codified at 30 U.S.C. § 863(o)).

*Second*, although the Senate report makes reference to a dispute-resolution process for

ventilation and roof control plans, that process is not one that Congress inscribed in the Mine

Act.  This is critically important, especially when one compares what the Mine Act says about

ventilation and roof control plans with the ERP dispute-resolution provision that Congress

created in 2006 in the MINER Act.  The ventilation plan provision, states only, in relevant part,

that "[a] ventilation system and methane and dust control plan and revisions thereof suitable to

the conditions and the mining system of the coal mine and approved by the Secretary shall be

adopted by the operator and set out in printed form within ninety days after the operative date of

this subchapter," and then "reviewed by the operator and the Secretary at least every six

months."  30 U.S.C. § 863(o).  In contrast, as pointed out above in the "Background," Congress

created for ERPs an elaborate dispute-resolution provision that: (1) does not require the operator

to violate the law before being heard by the Commission; (2) authorizes the Commission to

decide the merits of the plan dispute, as compared to merely a violation *vel non* of the Mine Act;

and (3) guarantees expedited review.  *See* 30 U.S.C. § 876(b)(2)(G).  Congress clearly knows

how to create administrative dispute-resolution provisions; for ventilation plans required by the Mine Act, it has done no such thing.

*Third*, MSHA's suggestion that the Senate report on the 2006 MINER Act describes a Commission-review procedure implicitly guaranteed by the Mine Act must be rejected because, as the D.C. Circuit has held, statements found in the legislative history of subsequent acts about what an earlier law means are, by definition, not authoritative legislative history for what Congress intended in enacting the earlier law. *See*, *e.g.*, *Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005) ("[P]ost-enactment legislative history is not only oxymoronic but inherently entitled to little weight.").[10]

For these reasons, Plaintiffs' claims are not claims for which they can obtain meaningful relief elsewhere, including at the Commission.  To be clear, Plaintiffs recognize that the Commission has, on occasion, assumed jurisdiction over "plan disputes" through the "technical violation" process described by MSHA.  *See*, *e.g.*, *C.W. Mining*, 18 FMSHRC 1740, 1747 (Oct. 1996).[11]  But that only means the practice has not been subjected to judicial scrutiny.  Thus exposed to such scrutiny, the "technical violation" review process should give the Court no pause.  The Commission, after all, is a "creature[] of statute" that has "no inherent power" to assume jurisdiction over subject matter not authorized by Congress.  *Am. Bus. Ass'n v. Slater*,

---

[10] Moreover, even with respect to the MINER Act itself, the D.C. Circuit has already questioned the reliability of the committee report on which MSHA now relies in light of the report having been published *six months after* the statute's enactment. *See Nat'l Mining Ass'n v. MSHA*, 512 F.3d 696, 700 n.4 (D.C. Cir. 2008) (noting dismissively that petitioner's "statutory interpretation relies on a Senate Committee Report published six months *after* the passage of the MINER Act. S.Rep. No. 109-365 (2006).").

[11] MSHA's concern that the Plaintiffs "inexplicably" failed to acknowledge this procedure in their Complaint (Mot. at 18) is perplexing – a plaintiff has no obligation to acknowledge the inapplicable.

231 F.3d 1, 9 (D.C. Cir. 2000); *see also Lyng v. Payne*, 476 U.S. 926, 937 (1986); *Kaiser Coal Corp.*, 10 FMSHRC 1165, 1169 (Sept. 1989).

Furthermore, even taken on its own terms, the "technical violation" review process is deficient on its face.  Inasmuch as mine operators do not have a guaranteed right under the Mine Act to a review by the Commission of plan disputes, the entire concept of manufacturing an artificial administrative controversy by violating the law long enough to draw a citation (hence the "technical violation"), after which the operator must immediately abate the violation and agree to obey MSHA's plan dictates while the case remains pending at the Commission, is chimerical.

The "authority" for the "technical violation" concept is an MSHA guidance document. *See* MSHA Program Policy Manual, Reference V.G.-4, pp. 3-5 (Feb. 2003) (available at http://www.msha.gov/REGS/COMPLIAN/PPM/PMMAINTC.HTM).  That provision states in relevant part that where an operator disagrees with MSHA over a plan provision, and "indicates a desire to seek a citation" to contest at the Commission, a citation should be issued.  *See id.* at 4. In order to draw that citation, the operator must momentarily violate the law by operating pursuant to a ventilation plan that MSHA has not approved, and then immediately abate the violation by amending its plan to comply with MSHA's dictates.  *See id.* at 4-5.

Far from being the solution to the injustice at bar, this process – to the extent it is even lawful, *see supra* – only exacerbates the due process violations inherent in the plan-approval process.  For one thing, MSHA's programmatic "guidelines" are famously *not* binding on MSHA, so operators such as Plaintiffs have no right to demand that MSHA comply with its policy.  This issue was examined by the D.C. Circuit in *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (Scalia, J.), where the question presented was whether

another of MSHA's "enforcement guidelines" was *binding* on the agency.  MSHA characterized

its enforcement guidelines "as no more than a 'general statement of policy'" that "'merely

provide general guidance and do not constitute rigid requirements which necessarily bind the

Secretary and restrict his statutorily-granted [sic] enforcement discretion.'"  *Id.* (quoting MSHA

brief).  In an opinion by then Judge Scalia, the D.C. Circuit agreed, emphasizing that the

guidelines had not been codified in the Code of Federal Regulations and that, in deference to

MSHA's characterization of them, could not be construed so as to bind MSHA.  *See id.* at 538-

39.  Furthermore, the Commission itself is powerless to make MSHA comply with its policies

and procedures.  *See id.*; *see also Wallace Bros.*, 14 FMSHRC 586, 588 (April 1992) ("The

Commission has been given no jurisdiction over MSHA's internal practices and procedures.").

As a consequence, it is specious, to say the least, that this process provides meaningful relief

when MSHA is not bound to comply with its policy.

  For another thing, *because* it is not binding on MSHA, this "technical violation" process

is illusory.  As MSHA points out, there is an expectation inferred from the vagueness of the

Mine Act that operators and MSHA are to negotiate the terms of a ventilation plan in "good

faith" antecedent to any dispute and consequent dispute resolution.  Mot. at 4 (citing cases).  The

problem with this expectation is that MSHA, unlike operators, has no incentive to act

expeditiously.  Thus, it is often the case that by the time the agency gets around to acting on a

plan submitted for approval, time is of the essence for the operator to obtain an approval of its

plan (in order for its mine to remain in operation), and it does not have time to challenge

MSHA's dictates, even if it could.  *See*, *e.g.*, Compl. ¶¶ 43, 74.  Nor can an operator "force" the

issue by acting unilaterally in violation of its approved plan.  MSHA will only issue a citation for

a "technical violation" if it agrees with the operator that negotiations are at an impasse.  If – in

the event MSHA refuses to acknowledge an impasse and agree to a staged violation – the operator proceeds unilaterally to operate without an approved plan, it risks heightened civil penalties and criminal prosecution for a "willful" violation, as do the individual mine managers responsible for the decision.  *See* 30 U.S.C. § 820(c), (d).  Such a process can never provide meaningful relief.  *See Ex Parte Young*, 209 U.S. 123, 148 (1908); *see also Thunder Basin*, 510 U.S. at 221 (Scalia, J., concurring).

Of course, Plaintiffs are at a disadvantage discussing this procedure in any great detail at this stage of the case since it concerns facts that are outside of the pleadings, but it should suffice for the moment to direct the Court's attention to a bill reported out of the House of Representatives' Education and Labor Committee just before the August 2010 recess that would, if enacted, and among other things, direct the Comptroller General of the General Accounting Office to report to Congress

> on the timeliness of [MSHA's] approval of underground coal mines' required plans and plan amendments, including –
>
>> (1) factors that contribute to any delays in the approval of these plans; and
>>
>> (2) as appropriate, recommendations for improving timeliness of plan review and for achieving prompt decisions.

Robert C. Byrd Miner Safety and Health Act, H.R. 5663, 111th Cong. § 206 (2010) (as reported in the House, July 29, 2010) (available at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=111_cong_bills&docid=f:h5663rh.txt.pdf) (copy of excerpt attached as Ex. 1).  Plaintiffs refer to this bill to give the Court the benefit of a different perspective than that provided by MSHA as to the *real-world* problems that mine operators face in getting MSHA to address their ventilation plan issues.  The 45-day-to-resolution provision in MSHA's *non-binding* Ventilation Handbook that it cites (Mot. at 5) is a farce.

On top of it all, even if Commission review were authorized (which it is not), and operators could seek review timely enough for it to be meaningful (which they cannot), the *years-long* backlog of cases pending at the Commission[12] is so great that there is no guarantee of when an operator's cause will be heard.[13]  All the while the operator must be ventilating its mine in ways that MSHA dictates, over the operator's better judgment as to how best to do so (*e.g.*, without scrubbers to protect the miners from Black Lung Disease, *inter alia*).

MSHA describes the Complaint as a "legal cipher."  Mot. at 10.  But that is just the arrogance of an agency that thinks it is above reproach.  The cipher interjected into this case is the "technical violation" dispute-resolution process of which MSHA so fondly speaks – an empty vessel if there ever were one.

## II.     THE COMPLAINT STATES A CLAIM.

Although certain in its opening argument that this Court does not have jurisdiction, MSHA alternatively contends that Plaintiffs have failed to state an actual claim under the Due Process Clause, the APA, or for *ultra vires* conduct.  Putting aside the riddle of how MSHA can be so certain this Court lacks jurisdiction (and that the Commission definitely has jurisdiction) if it cannot discern the contours of the claims as stated, the Complaint plainly does state cognizable claims under any fair view of the notice pleading standard codified in Rule 8 of the Federal Rules of Civil Procedure.

---

[12] http://edlabor.house.gov/documents/111/pdf/testimony/20100223MaryLuJordanTestimony.pdf (Feb. 23, 2010 testimony before the House Committee on Education and Labor of Commission Chair Mary Lu Jordan: "Reducing the Growing Backlog of Contested Mine Safety Cases").

[13] MSHA cites the Mine Act provision granting the Commission authority to grant an operator temporary relief.  Mot. at 7 (citing 30 U.S.C. § 815(b)(2)).  That provision does not apply to citations, however, only mine closure orders.  Moreover, as an historical fact, the Commission has never granted temporary relief; that provision is effectively a dead letter.

If the Complaint lacks the factual precision that MSHA would prefer, that is a function of

the very problem of which Plaintiffs complain, not a defect in the pleading.  The Complaint

reflects MSHA's own imprecision and evasiveness in its handling of the Plaintiffs' ventilation

plans.  *E.g.*, Compl. ¶¶ 45, 52.  MSHA's misconduct is not typically inscribed on paper in black

and white for Plaintiffs to read; nor is it highlighted on the MSHA website.  Indeed, if the rigid

and arbitrary beliefs that MSHA is imposing on Plaintiffs' mines are memorialized in any form,

Plaintiffs are not aware of it.  Perhaps there are e-mails.  Perhaps there are minutes of intra-

agency enforcement conferences.  Perhaps there are file memos.  More likely though, there are

just unmemorialized phone calls and verbal directives that go down the chain of MSHA

command and ultimately get arbitrarily applied to Plaintiffs because, in the real world, that is the

way MSHA works.

The Federal Rules have an answer for this dilemma: discovery.  *See* Fed. R. Civ. P. 26-

37.  If discovery yields no support for Plaintiffs' allegations, then MSHA has Rule 56 under

which it can move for summary judgment, but that comes later.  First, Plaintiffs have a right to

discovery to expose and document the facts.  This notion seems lost on MSHA, which time and

again in its Motion faults Plaintiffs for not providing enough factual detail.  MSHA presumes too

high a standard at the pleading stage; this is not a fraud case.  *See* Fed. R. Civ. 9(b).  For the time

being, it is enough that Plaintiffs have alleged facts that, if true, plausibly give rise to the stated

claims.  It would only perpetuate the very lack of due process of which Plaintiffs complain for

MSHA to avoid answering the Complaint because, due to MSHA's own evasiveness, Plaintiffs

have not enumerated in their Complaint all of the factual details which MSHA says are missing.

### A.    Standard Of Review.

In its complaint, a plaintiff need provide no more than a "short and plain statement of the

claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 8 thus codifies

"notoriously loose pleading criteria," *Tooley v. Napolitano*, 556 F.3d 836, 840 (D.C. Cir. 2009),

*reh'g granted and vacated* (D.C. Cir. Jul. 1, 2009), *and on reh'g*, 586 F.3d 1006 (D.C. Cir.

2009), which this Court has recently described as "generous." *Am. Petroleum Inst. v.

TechnoMedia Int'l, Inc.*, 699 F. Supp. 2d 258, 272 (D.D.C. 2010) (Leon, J.).  And while a casual

reader of MSHA's motion would have to be excused for not realizing it, the Supreme Court's

decision in *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007), "leaves the longstanding

fundamentals of notice pleading intact." *Tooley*, 556 F.3d at 839 (quoting *Aktieselskabet AF 21.

November 2001 v. Fame Jeans*, 525 F.3d 8, 17 (D.C. Cir. 2008)).

Accordingly, under this "notoriously loose" and "liberal pleading standard," a Court may

not dismiss a complaint that states plausible grounds for relief, "even if it strikes a savvy judge

that ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 557 (internal citations

omitted); *accord Wanko v. Catholic Univ. of Am.*, Slip Copy, No. 08-2115, 2009 WL 3052477,

at *2 (D.D.C. Sept. 22, 2009) (Leon, J.) ("A plaintiff's complaint need only set forth a short and

plain statement that gives defendants fair notice of the claim and grounds upon which the

complaint rests.") (citing *Dave v. Lanier*, 606 F. Supp. 2d 45, 48 (D.D.C. 2009)).

### B.      The Complaint States A Claim Under The Due Process Clause Of The Fifth Amendment.

The federal government violates the due process rights guaranteed by the Fifth

Amendment to the United States Constitution when it deprives a company of protected property

or liberty interests without due process of law.  *See United States v. James Daniel Good Real

Prop.*, 510 U.S. 43, 48 (1993).  Because the Complaint identifies protected interests and alleges

that Plaintiffs have been deprived of their interests without due process of law, the Complaint

states claims under the Due Process Clause.

**1.      Plaintiffs Have Identified Protected Property Interests.**

Notwithstanding the right of MSHA to regulate certain conduct, the Fifth Amendment states that the U.S. may not deprive the citizens of "life, liberty, property" without due process of law.  So while MSHA may certainly exercise its police power to shut down a mine where legally justified, it may not do so without due process.  This is what distinguishes the United States from totalitarian regimes.

MSHA's first attack is on the nature of the property interests identified in the Complaint. What MSHA fails to acknowledge is that property interests need not be tangible in order to be protected by the Fifth Amendment.  Indeed, the "types of interests protected as property are varied and, as often as not, intangible, relating to the whole domain of social and economic fact." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430-31 (1982) (citations and internal quotation marks omitted).

For example, in *General Electric*, the U.S. stipulated that the "costs of compliance [with CERCLA] and the monetary fines and damages associated with noncompliance qualify as protected property interests." *GE II*, 610 F.3d at 117.  And in *McNary*, the Supreme Court held that "the opportunity to obtain gainful employment is plainly sufficient to mandate constitutionally fair procedures in the [temporary agricultural worker] application process." *McNary*, 498 U.S. at 491.  The same concept is demonstrated by *FDIC v. Mallen*, 486 U.S. 230, 240 (1988), in which the Court explained that it "is undisputed that appellee's interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause."  The Court continued: "The District Court and the parties correctly recognized that the FDIC cannot arbitrarily interfere with appellee's continuing employment relationship with the bank, nor with his interest as a substantial stockholder in the bank's holding company."  *Id.; see also Feinberg v. FDIC*, 522

F.2d 1335, 1339-40 (D.C. Cir. 1975) ("The conclusion is unavoidable that the [FDIC's] order [suspending the bank president] effectively deprives appellant of the ability to engage in his chosen profession and of his property interests in his salary and in voting his stock, as well as that which he holds as administrator of his deceased brother's estate.").

Plaintiffs' Complaint identifies several constitutionally protected interests that fall neatly within the ambit of those described in the cited and similar cases:

>    a.      *Plaintiffs' Interests in a Safe and Healthy Workforce.*

Plaintiffs have a protected interest in the safety and health of their workforces.  Compl. ¶¶ 59, 70, 81.  A safe and health workforce is necessary to the success of Plaintiffs' mines. While MSHA derides this notion as equating miners with chattel, *see* Mot. at 22, that is a mischaracterization intended solely as a rhetorical "zinger."  The Mine Act itself, after all – in the very first line of that Act – refers to miners as the mining industry's "most precious resource," and makes it clear that the health and safety of that resource is the first priority of the law.  30 U.S.C. § 801(a).  Viewed in this light, it can be seen why Plaintiffs have a protected interest in the well-being of this "resource"; not in the sense of the miners being chattel, but in the sense that if a mine does not have a safe and healthy workforce, it cannot operate any more effectively than it could without functional mining equipment.  Indeed, this is true of any employer.  If a government official were to show up at one of the Plaintiff's mines and dismantle the heavy-duty mining equipment; or show up at a law office and smash computers; or show up at a dentist's office and break the examination lights, that conduct would effect a deprivation of property.  It is no different if the U.S.'s conduct jeopardizes employee health and safety – a business can no more operate without healthy and safe employees that it can without functioning equipment.

From out of Left Field, MSHA attempts to equate Plaintiffs' position on this point with that of the long-discredited *Lochner* line of cases.  *See* Mot. at 22.  Strange, given that Plaintiffs are not attacking the merits of the Mine Act as a whole, or challenging Congress's right to regulate mine safety and health.  The only issue is whether one provision of the Mine Act and the manner in which that provision is implemented fail to provide adequate due process safeguards – hardly a radical theory.  *See*, *e.g.*, *Free Enterprise*, 130 S. Ct. 3138; *McNary*, 498 U.S. 479.

b.      *Plaintiffs' Interests in Economically Viable Mines.*

As mine operators, Plaintiffs have very strong incentives to avoid being shut down.  If their mines cannot operate, they cannot produce and sell coal, meaning they cannot generate income[14] and pay wages.  Faced with coal shortfalls, coal-fired electric utilities have to raise their rates or shut down themselves, meaning consumers must find alternative and more expensive energy supplies for their electricity needs, and meanwhile out-of-work miners can no longer support their families or spend in their communities.  In other words, remaining in operation is of profound importance, and readily comes within the realm of a protected property interest.  Compl. ¶¶ 59, 70, 81.

To be clear, Plaintiffs are not claiming to have a *guarantee* that their mines will remain viable, or – as MSHA incorrectly puts it – a right to operate their mines only "in the way Plaintiffs see fit to operate them."  Mot. at 24.  Plaintiffs recognize that circumstances can arise that would permit MSHA to take steps within its authority to affect the operations of their mines, and even to close them, be it temporarily or permanently.  For that reason, MSHA's citations

---

[14] In a clause set off by dashes, MSHA emphasizes early in its motion Plaintiffs' desire to "extract profits" from their mines as if to suggest they have some secret, avaricious motivation for bringing this lawsuit.  *See* Mot. at 1.  But the fact of the matter is that coal mines – like any business – do have a vested interest in generating profits.  Unlike the federal government, private companies depend on profits to remain afloat.  Plaintiffs hardly need to apologize for capitalism.

(Mot. at 25) to *Comtronics v. Puerto Rico Telephone Co.*, 409 F. Supp. 800 (D.P.R. 1975), and *Burns Harbor Fish Co. v. Ralston*, 800 F. Supp. 722 (S.D. Ind. 1992), miss the mark.  All Plaintiffs are claiming – and it hardly seems groundbreaking – is that, *in the normal course of business*, they have a protected interest in the going concerns of their mines.  The revenues generated by those mines are, after all, what pay the salaries of their miners, and pay for the equipment that enables Plaintiffs to operate and employ miners, *inter alia*.

> c.  *Plaintiffs' Interests in Developing and Implementing Their Own Ventilation Plans Suitable to the Conditions and Mining Systems at Their Mines.*

The Complaint also identifies a protected property interest in Plaintiffs' right to develop and implement their own ventilation plans consistent with prudent mining engineering and safety and health practices, and suitable to the conditions and mining systems at their respective mines. Compl. ¶¶ 59, 70, 81.  MSHA contends that this right flows directly from the Mine Act itself, 30 U.S.C. § 863(o), and, citing *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005), argues that a ventilation plan approval is a discretionary governmental benefit, not a protected property interest.  Mot. at 26.  Not so.  Mine operators have an inherent right to design and implement their own ventilation plans, provided they are consistent with prudent mining engineering and safety and health practices, and suitable to the conditions and mining systems at their respective mines, and that the Mine Act does no more than acknowledge this right.

The Mine Act plan-approval scheme is *sui generis*, putting the onus of developing ventilation plans in the first instance on operators.   *See* 30 U.S.C. § 863(o); 30 C.F.R. § 75.370(a)(1).  While the plan is subject to MSHA's approval, MSHA is not the operator, and is not in the best position to know what makes the most sense at the mine.  Mine plans are inherently mine-specific – they must be "suitable" to the mine – and MSHA does not know the conditions of a mine as well as the operator.  *Cf. Zeigler*, 536 F.2d at 406-07.  Moreover, if

something goes wrong as a result of a mine plan design flaw, it is the operator – not MSHA – that suffers the consequences.  MSHA's role in the approval process is to verify that the operator's plan, as submitted, is consistent with prudent mining engineering and practices. Nothing more.  If the plan meets that standard, it should be approved, even if MSHA might have designed some aspect of the plan differently had it been responsible for the plan.  Accordingly, a ventilation plan is more than a mere governmental "benefit"; it is a protected property interest that stems from the inherent right to engage in the business of mining under the laws of the state in which the mine is located.

*d.    Other Protected Interests.*

In addition to those interests expressly identified, the Complaint also clearly left the door open for Plaintiffs to flesh out the other protected interests affected by MSHA's conduct. Compl. ¶¶ 59, 70, 81 ("The Plaintiffs have constitutionally protected interests in, *inter alia*: ***").  Scrubbers, for example, cost a lot of money.  It also costs a lot of money to train miners on a ventilation plan, and to design and configure equipment and sophisticated electrical systems in the mine appropriately to accommodate a ventilation plan or any change thereto.   In general, Plaintiffs' underground coal mines are equipment-intensive operations that are very expensive to operate and maintain. Plaintiffs have a right to use their property in a lawful manner, and every time MSHA requires Plaintiffs to make a change to their ventilation plans over the Plaintiffs' better judgment, these property interests are adversely affected.

**2.    Plaintiffs Have Alleged a Deprivation of Their Protected Interests.**

MSHA seems exercised that Plaintiffs have not alleged "anywhere ... that Defendants have actually issued a formal denial as to any of their proposed ventilation plans."  Mot. at 23. Even putting aside that such an allegation is both immaterial and unnecessary under the

"generous" pleading criteria of Rule 8, the assertion is just plain wrong.  In paragraph 46, for

example, Plaintiffs allege:

> In particular, the Defendants have established a pattern and practice of refusing to allow the Plaintiffs' mines to implement any number of sound practices that are suitable to the conditions and mining systems at their respective mines, including, *inter alia*, (i) the use of certain ventilation control devices known as scrubbers, (ii) the right to design their ventilation systems to *blow* fresh air across the working coal face (*i.e.*, blowing ventilation systems) instead of having to rely on, as the Defendants demand, inductive ventilation systems that *draw* fresh air across the working coal face in far less quantities (*i.e.*, exhausting ventilation systems); (iii) the right to ventilate the "gob" areas (*i.e.*, inaccessible mined out areas) of their mines without artificial ventilation controls, as the Defendants demand, that restrict air flow across the gob and make the mine less safe for the miners by failing to dilute potential accumulations of methane and other gas-air mixtures to the degree that the Plaintiffs' preferred ventilation methods would; and (iv) the right to use methods of evaluating the effectiveness of the respective mines' bleeder entries (*i.e.*, tunnels utilized as air courses to dilute and carry away methane and other noxious fumes) that do not require sending mine examiners into potentially hazardous areas of the mines where it would be unnecessary to do so but for the Defendants' demands to do so.

Compl. ¶ 46.  In paragraphs 50 and 51, Plaintiffs allege that MSHA has refused to allow them to

use scrubbers at certain mines.  And at paragraph 74 Plaintiffs allege that MSHA:

> has systematically, and without regard to the conditions and mining system of the individual mines, disapproved or failed to approve the Plaintiffs' ventilation plans unless and until the Plaintiffs have implemented the Defendants' demands that, *inter alia*, they not use scrubbers at their mines, they only use exhausting ventilation systems, they construct artificial ventilation controls that restrict air flow and thus inhibit the dilution of potentially hazardous methane and other air-gas mixtures, and they utilize one or more mine examiners in all circumstances to evaluate the effectiveness of their bleeder entries, even where an alternative means of evaluation would be safer and no less effective

Compl. ¶ 74.  All of these allegations state, certainly implicitly if not expressly, that numerous

ventilation plans have been denied as proposed.  These are factual assertions.  Rule 8 does not

require more detail, such as dates or names.

As for the deprivation of Plaintiffs' constitutionally protected interests, MSHA's conduct

immediately deprives Plaintiffs of their protected interests in the design and implementation of

their ventilation plans, and in the lost investments in and benefits of their mothballed scrubbers and other equipment, the design and configuration of superseded ventilation plans, and the training of their miners.  The Complaint also clearly alleges that MSHA's conduct forces Plaintiffs to choose between remaining in operation and implementing measures that optimize the safety and health of their miners.  Compl. ¶ 74 ("This has left the Plaintiffs with having to choose between refusing to implement the Defendants' demands, in which case they cannot operate and their employees must be put out of work, or implementing the Defendants' demands and obtaining approval of ventilation plans that are less protective of the safety and health of their miners.").

As explained, the economic vitality of a coal mine is essential, not only to Plaintiffs but for the many downstream effects of the mine.  But the consequences of remaining in operation can include a diminution of miner safety and health where, as in the circumstances alleged in the Complaint, MSHA demands changes to Plaintiffs' ventilation plans that are not as safe or healthful as the provisions that Plaintiffs themselves would otherwise include in their ventilation plans.  To be sure, the deprivation here is not sudden and obvious – in particular, change in a miner's health due to a change in a ventilation plan is not something that can be observed at the time of the change to the ventilation plan, as could, say, the act of putting a man in jail.  But the difficulty in perceiving the deprivation does not subtract from the reality of it.  If, by comparison, an MSHA inspector determined arbitrarily that a mine could not use a particular heavy-duty mining machine, and decided to enforce his rogue decision by going to the mine once a week and giving it a single blow of a sledgehammer, the fact that the machine remained operative for the time being would not lessen the constitutional infirmity of the inspector's action, and there is no common-sense reason to think the operator should have to wait for the 50th or 100th or 1,000th

blow to finally extinguish the functionality of the machine before it could bring a due process complaint against MSHA.

MSHA's "no deprivation" argument essentially boils down to an issue of standing: MSHA believes Plaintiffs have not demonstrated a due process injury in fact. *See Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) (holding that to show standing, a "plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent"). That argument must fail, though, because Plaintiffs have alleged that, as a result of MSHA's conduct, they have been placed between a rock and hard place of two distinct and mutually exclusive property interests (economic vitality and a safe and healthy workforce). Compl. ¶ 74. Avoiding the deprivation of one necessitates the deprivation of the other, and this conundrum repeats itself every time MSHA acts in the manner of which Plaintiffs complain.

MSHA's objection to Plaintiffs' use of the phrase "pattern and practice" as being a mere "formulaic recitation without specific allegations of fact" (Mot. at 23) is ironic given its own formulaic recitation of "*Twombly*" and "*Iqbal*" as if those words were talismanic. They are not; MSHA is simply confused about Plaintiffs' pleading obligations. MSHA is also confused about what it means to state a "pattern and practice" claim. The "pattern and practice" of which Plaintiffs complain is nothing more than systematic failure of MSHA to approve Plaintiffs' ventilation plans for rote and arbitrary reasons that are applied without regard to the conditions and mining systems of Plaintiffs' mines. *E.g.*, Compl. ¶ 74. It is a "pattern and practice" because MSHA repeats the same conduct time and again, not because Plaintiffs have joined in

this lawsuit to take up a common grievance.  The identified pattern and practice exists as to any one of Plaintiffs' mines as much as it does to all of them.[15]

### 3.    Plaintiffs Have Alleged a Denial of Due Process.

MSHA contends (Mot. at 27) that because Plaintiffs could have their grievances heard by the Commission, the Complaint fails to plead facts sufficient to demonstrate a denial of due process in connection with the deprivation of their constitutionally protected interests.  For the reasons stated above in Part I.B.2, this argument lacks merit.  Beyond that, the balance of the classic due process analysis set out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), is fact-dependent and cannot be decided at this juncture.[16]

### C.    The Complaint States Claims For *Ultra Vires* Conduct And Under The APA.

Parallel to Counts III and V is Count IV, which claims that because MSHA's actions of repeatedly failing to approve Plaintiffs' ventilation plans for rote and arbitrary reasons, without regard to the conditions and mining system of Plaintiffs' mines, were unconstitutional, the conduct of MSHA and the individual Defendants was also *ultra vires*.  Alternatively, viewed as a

---

[15] It is unclear how MSHA reaches its conclusion that the Plaintiffs' claims are contradicted by the fact that the Plaintiffs have previously been permitted to use scrubbers at their mines (Compl. ¶ 49).  Mot. at 24.  That MSHA may have acted rationally and lawfully in the past, and perhaps may even act so with respect to other operators in the present, says nothing about their conduct with regard to these Plaintiffs in the circumstances described in the Complaint.

[16] Once again misleading in its portrayal of the Commission's authority, MSHA argues that the Commission exercises discretionary review over any case involving "a substantial question of law, policy or discretion," "any decision 'contrary to law or Commission policy,'" or where "a novel question of policy has been presented."  Mot. at 28 (citing 30 U.S.C. § 823(d)(2)(A)(ii)(V), (d)(2)(B)).  Obviously intended to portray the Commission as a powerful independent voice in resolving Mine Act disputes, what MSHA is not telling this Court is that those grants of authority – admittedly broad if construed literally – have been construed very narrowly by the D.C. Circuit, *at MSHA's urging*, to the point that the Commission has essentially no discretion to disagree with MSHA on questions of law, and its authority to determine questions of "policy" means only *internal Commission policy*, not "Mine Act policy."  *See Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 160-61 (D.C. Cir. 2006); *Energy West Co. v. FMSHRC*, 40 F.3d 457, 464 (D.C. Cir. 1994).

matter of official agency action, Count VI claims that MSHA's actions were arbitrary and capricious and can be set aside under the APA.

### 1.      An *Ultra Vires* Conduct Claim Has Been Stated.

Count IV, alleging that MSHA acted *ultra vires*, is stated in the Complaint to supplement Counts III and V, on the theory that when a government agency or its officials acts outside the scope of their delegated authority, that *ultra vires* conduct is actionable in federal court. *Larson v. Domestic &Foreign Commerce Corp.*, 337 U.S. 682, 689-91 (1949). Count IV does not rest on a mere "claim of error" by MSHA or the individual Defendants (Mot. at 29); it rests on the claim that MSHA and the individual Defendants have acted in excess of their statutory authority. Compl. ¶ 78.

Plaintiffs do not understand MSHA's objection to their having sued the individual Defendants in their individual capacity while only seeking injunctive relief. Mot. at 9, 31. Inasmuch as *ultra vires* conduct is inherently non-official, *see Larson*, *supra*, Plaintiffs could not have sued the individual Defendants for *ultra vires* conduct in their official capacities. Plaintiffs could certainly amend their Complaint to add a prayer for damages. That seems unnecessary, though, and Plaintiffs are not aware of any principled reason why they cannot ask this Court to order the individual Defendants in equity to comport themselves with their delegated authority. That seems to have been just the point the Supreme Court made in *Larson*, 337 U.S. at 689-91, 701-02, in which it held that suits against individual agency officials for conduct that is not within their statutory powers (*ultra vires*) or is unconstitutional are actionable against the

individuals, and that such individual conduct "may be made the objective of *specific relief*." *Id.*
at 689 (emphasis added).[17]

### 2.   An APA Claim Has Been Stated.

As this Court is aware, review under the APA rests on there being final agency action
that is subject to review. *See* 5 U.S.C. §§ 702, 704.  MSHA complains that Plaintiffs have not
identified a final agency action. *See* Mot. at 31-32.  Not true.  An agency action is "final" if it
"marks the consummation of the agency's decisionmaking process" and is one "by which rights
and obligations have been determined, or from which legal consequences will flow." *Bennett v.
Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations and citations omitted).  The Complaint,
Count VI, satisfies the *Bennett* standard.

The Complaint states: "Each instance of the Defendants ... denying the Plaintiffs the right
to ventilate their respective mines in a manner consistent with prudent mining engineering and
safety and health practices suitable to the conditions and mining systems at those mines
constitutes a final agency action reviewable by this Court under the APA."  Compl. ¶ 85.  Two
distinct types of final agency action are at issue.  The first are acts of approving ventilation plans
that omit – because MSHA will not allow them – key provisions that are in the best health and
safety interests of Plaintiffs' miners at a given mine.  The second type is manifested when
MSHA disapproves a specific request, such as the request to use scrubbers, whether by phone

---

[17] *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 23-24 (D.D.C. 2007), is not to the contrary.  The point
made in *Hatfill* is that to the extent a plaintiff asks a court to corral prospective official conduct,
that can only be done to the extent the plaintiff is seeking relief against that person in his official
capacity, for it is governmental conduct, not any particular individual, from which the plaintiff
seeks relief.  *Hatfill* appears to have been dismissing the *ultra vires* claim; not establishing fixed
rules for relief available in all instances.  Nor could it have, because *Larson* teaches that to the
extent a plaintiff is complaining about *ultra vires* conduct, the claim is properly stated against the
individual and "specific relief" can be granted.  *Larson*, 337 U.S. at 689-91.

call, in-person meeting, or by not responding at all, as is frequently the case.  *See* Compl. ¶¶ 84-87.  For pleading purposes, no greater specificity is necessary.

The Complaint is not impermissibly vague, and does not justify MSHA's characterization of Plaintiffs' case as a "programmatic attack" on MSHA decision-making generally.  Thus, MSHA's reliance on *Friend of the Earth, Bluewater Network Division v. Department of Interior*, 478 F. Supp. 2d 11, 25 (D.D.C. 2007), and *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990), is misplaced.  The fact that Plaintiffs' ventilation plans for their various mines do not permit them to use scrubbers (Compl. ¶¶ 50-52), among other things, necessarily means that, at a certain point in time, MSHA made a final decision as to the content of each mine's ventilation plan.  Again, Plaintiffs could amend to provide specific dates, but those dates and the related facts and records are part of the administrative record that MSHA bears the burden of compiling.

To take the scrubber issue as an example – whether it is executed in a formal or informal manner, MSHA's decision(s) to deny Plaintiffs the right to use scrubbers is arbitrary.  There is no basis known by Plaintiffs why scrubbers would never be beneficial to miner health.  There are numerous studies by the National Institute of Occupational Safety and Health substantiating the effectiveness of scrubbers (Compl. ¶ 47).  MSHA denying Plaintiffs the right to use scrubbers is like the National Highway Traffic Safety Administration prohibiting General Motors from installing seatbelts in its cars – it makes no sense; at the very least, MSHA has not offered a rational basis for its actions.  Furthermore, each such decision to prohibit the use of scrubbers – whether omitted from an otherwise approved ventilation plan or communicated independently – is final as to the affected mine.[18]  Plaintiffs have alleged that MSHA has denied them, arbitrarily,

---

[18] This is true even if MSHA dangles the possibility of changing its mind.  *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.").

the right to use scrubbers, *inter alia*, at 14 mines referenced in the Complaint.  *See id.* ¶ 51.  This

is a classic APA claim.

## **CONCLUSION**

MSHA's motion to dismiss should be denied.

Respectfully submitted,

/s/ *Timothy M. Biddle*
Timothy M. Biddle, D.C. Bar #89284
Thomas C. Means, D.C. Bar #254318
Daniel W. Wolff, D.C. Bar #486733
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-624-2500 (phone)
202-628-5116 (fax)

Attorneys for Plaintiffs

Dated:  September 21, 2010

13065028