**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ELK RUN COAL COMPANY, INC., et al.,

     Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
LABOR, et al.,

     Defendants.

Civil Action No. 10-1056 (JEB)

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are six underground coal mine operators who, among them, operate at least

fourteen mines.  They have brought this action against, *inter alia*, the Mine Safety and Health

Administration, claiming MSHA has violated their constitutional rights.  More specifically,

Plaintiffs assert that they are being denied due process by MSHA's lack of appropriate

procedures to resolve disputes over mine-ventilation plans.  In now moving to dismiss the case,

Defendants stress the Court's lack of jurisdiction to hear claims arising from the Federal Mine

Safety and Health Act's exclusive administrative enforcement regime.  Concluding jurisdiction

does exist, the Court will permit certain pattern-and-practice claims to proceed, while granting

Defendants' Motion in regard to Plaintiffs' facial constitutional challenge and other ancillary

causes of action.

I.     **Factual Background**

     A.     <u>The Mine Act</u>

In enacting the Federal Mine Safety and Health Act of 1977 (Mine Act), Congress

declared, "[T]he first priority and concern of all in the coal or other mining industry must be the

health and safety of its most precious resource – the miner," and "the existence of unsafe and unhealthful conditions and practices in the Nation's coal or other mines is a serious impediment to the future growth of the coal or other mining industry and cannot be tolerated." 30 U.S.C. §§ 801(a) and (d). Congress thus passed the Mine Act to, in part, establish "mandatory health and safety standards" and require that "each operator of a coal or other mine and every miner in such mine comply with such standards." §§ 801(g)(1)-(2).

The Mine Act "vests broad authority in the Secretary of Labor to promulgate regulations governing the mining industry and to investigate and remedy safety concerns." Kerr-McGee Coal Corp. v. Federal Mine Safety and Health Review Commission, 40 F.3d 1257, 1259 (D.C. Cir. 1995). The Act is administered by the Mine Safety and Health Administration (MSHA), a subdivision of the Department of Labor. MSHA "regulates mine operation in two ways. First, it promulgates pursuant to [30 U.S.C. § 811] regulations that establish general and mandatory standards with which all mine operators must comply. Second, it requires mine operators to compile comprehensive plans" containing individualized regulations tailored to specific components of each mine. United Mine Workers of America, Int'l Union v. Dole, 870 F.2d 662, 667 (D.C. Cir. 1989).

Among the Act's requirements are that a mine operator submit and obtain approval of a ventilation plan for each operated mine. 30 U.S.C. § 863(o). Section 863(o) provides:

> A ventilation system and methane and dust control plan and revisions thereof suitable to the conditions and the mining system of the coal mine and approved by the Secretary shall be adopted by the operator and set out in printed form within ninety days after the operative date of this subchapter. The plan shall show the type and location of mechanical ventilation equipment installed and operated in the mine, such additional or improved equipment as the Secretary may require, the quantity and velocity of air reaching each working face, and such other information as the Secretary may require.

A mine's ventilation plan must also be reviewed by MSHA every six months. Id.

Once a mine-ventilation plan has been approved by MSHA and adopted by the mine operator, the plan becomes enforceable as a mandatory health and safety standard under the Act. Zeigler Coal Co. v. Kleppe, 536 F.2d 398, 409 (D.C. Cir. 1976); UMWA, 870 F.2d at 667. MSHA enforces the Act's mandatory health and safety standards through the issuance of citations that carry civil or criminal penalties.  When the Secretary believes that a mine operator has violated the terms of "any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter, he shall, with reasonable promptness, issue a citation to the operator."  30 U.S.C. § 814(a).

The Mine Act also prescribes the procedures a mine operator must follow to contest the issuance of a citation or unfavorable order.  See 30 U.S.C. §§ 815, 816, 823.  Such disputes are adjudicated by an independent body – the Federal Mine Safety and Health Review Commission – created by the Act for this purpose.  §§ 823, 815(d).  The operator must contest the citation or order within 30 days of receiving it by notifying the Secretary.  § 815(d).  Upon receiving such notification, the Secretary "shall immediately advise the Commission of such notification, and the Commission shall afford an opportunity for a hearing."  Id.  This initial hearing may be before an administrative law judge appointed by the Commission.  § 823(d).  A mine operator may appeal the ALJ's decision to the Commission as a whole.  Id.  A mine operator "adversely affected or aggrieved by an order of the Commission issued under this chapter may obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or in the United States Court of Appeals for the District of Columbia Circuit . . . ."  § 816(a)(1).

While the Mine Act prescribes the enforcement and appeal procedures governing the relationship between MSHA and a mine operator operating a mine with an approved ventilation

plan, the Act does not explicitly outline the procedures that govern a pre-adoption/approval

dispute between a mine operator and MSHA.  Perhaps in recognition of this fact, MSHA has

published two documents that describe the Agency's recommended practices: the Mine

Ventilation Plan Approval Handbook No. PH92-V-6 (available at

http://msha.gov/READROOM/HANDBOOK/PH92-V-6.pdf) and MSHA's Program Policy

Manual, Reference V.G-4, Mine Plan Approval Procedures, "Contest of Mine Plan Approval

Actions" (available at: http://www.msha.gov/REGS/COMPLIAN/PPM/PMMAINTC.HTM)

(Policy Manual).

Because the existence and sufficiency of the ventilation-plan dispute-resolution process

described in the Policy Manual is at the heart of the dispute in the present case, the Court will

reproduce the relevant portions at some length:

> In those situations when MSHA can no longer accept a provision of
> an approved plan, cannot approve a provision in a new plan, or
> cannot approve a proposed change to an approved plan, operators
> should be afforded the opportunity to contest MSHA's denial of
> approval.  Where the operator disagrees with MSHA and indicates
> the desire to seek a citation to contest before the Federal Mine
> Safety and Health Review Commission, a citation should be issued.

Id. at 4.  When MSHA determines that a plan is no longer adequate, it may revoke approval of

the plan:

> Upon revocation of approval, a citation must be issued for operating
> without an approved mine plan.   Abatement can then be
> accomplished by the operator adopting a plan provision satisfying
> MSHA's concern.  It may be appropriate for the operator to have
> this acceptable plan provision prepared before the citation is issued
> so that prompt abatement occurs.  With this approach, there is no
> need to operate in violation of the mine's approved plan, and the
> violation would be "technical" in nature.

Id.

> In the case of an operator-proposed change to an existing approved
> mine plan, if approval of the change is denied, the operator could

4

> notify the District that, as of a certain date, the mine's existing approved plan is no longer adopted by the operator, and that the operator intends to adopt the proposed change which is not approved.  On that date, a 104(a) citation would be issued for the operator's failure to have and adopt an approved plan.  Abatement would be achieved by the operator promptly adopting the provisions of the most recently approved plan for the mine.  Again, there need not be any changes made in the actual mining procedures, and the violation would be "technical" in nature.

Id. at 4-5.

> The case of a new mine plan with a provision that cannot be approved could be handled in a similar manner.  The operator could indicate that mining operations will begin on a particular date, using the plan that contains the provision which is not approved.  On the date indicated for starting operations, a citation would be issued for failure to adopt and follow an approved plan, as required by the applicable standard.  Abatement would be achieved by the operator promptly adopting provisions that satisfy MSHA's previously documented concerns. . . .

> In each of these cases, the operator would have the option of contesting the citation issued and presenting to an administrative law judge the reasons why the disputed plan provision should have been approved.

Id.

B.    The Current Action

As the operators of underground coal mines, Plaintiffs are regulated by the Mine Act as enforced by the Secretary of Labor and MSHA.  Compl., ¶ 2.  On June 22, 2010, Plaintiffs filed this action against the Department of Labor, MSHA, and three MSHA officials in both their official and individual capacities.  Id., ¶¶ 18-22.  Plaintiffs assert claims under the Due Process Clause of the Fifth Amendment, the Declaratory Judgment Act, and the Administrative Procedure Act.  Id., ¶ 1.

Plaintiffs' suit centers around the Mine Act's ventilation-plan approval process.  Plaintiffs complain first that the Mine Act is facially unconstitutional because it "does not

provide any dispute-resolution mechanism in the event an operator and MSHA cannot agree on the terms of a ventilation plan." Id., ¶ 4. "Nor does the Mine Act or regulations promulgated by MSHA set any limit on the time for MSHA to review and approve or deny a submitted ventilation plan." Id. Thus, Plaintiffs allege, "[o]perators are therefore dependent on MSHA to act objectively and in good faith in the plan-approval process. When MSHA fails to act in good faith – either through unreasonable delay in its consideration of a ventilation plan or by conditioning approval on some demand that is not reasonably related to the safety or health of miners at the operator's mine – an operator has no recourse under the Mine Act and is denied due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution." Id.

As separate counts, Plaintiffs further allege that MSHA has applied the Act in a manner that denies them procedural and substantive due process under the Fifth Amendment. In particular, Plaintiffs contend that "Defendants have through a pattern and practice repeatedly failed to afford the Plaintiffs the process due under the Mine Act inasmuch as [they have] systematically, and without regard to the conditions and mining system of the individual mines, disapproved or failed to approve the Plaintiffs' ventilation plans unless and until the Plaintiffs have implemented the Defendants' demands that, *inter alia*, they not use scrubbers at their mines, [and] they only use exhausting ventilation systems . . . ." Id., ¶ 74. "Defendants have deprived the Plaintiffs of such interests without affording the Plaintiffs the necessary opportunity to be heard," which, Plaintiffs allege, "has left Plaintiffs with having to choose between refusing to implement the Defendants' demands, in which case they cannot operate and their employees must be put out of work, or implementing the Defendants' demands and obtaining approval of ventilation plans that are less protective of the safety and health of their miners." Id., ¶¶ 74-75; see also, id., ¶¶ 81-83.

Finally, Plaintiffs allege that if the Mine Act, including Defendants' enforcement of it, is

constitutional, Defendants have nonetheless acted in excess of their statutory authority (and

therefore *ultra vires*), or, in the alternative, arbitrarily and capriciously in violation of the

Administrative Procedure Act.  Id., ¶¶ 78, 85-86.

On August 24, 2010, Defendants filed this Motion to Dismiss under Federal Rules of

Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state

a claim.[1]

## II.    Legal Standard

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's

factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be

derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C.

Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal

citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir.

2005). This standard governs the Court's considerations of Defendants' Motions under both

Rules 12(b)(1) and 12(b)(6).  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("in passing on a

motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for

failure to state a cause of action, the allegations of the complaint should be construed favorably

to the pleader"); Walker v. Jones, 733 F.2d 923, 925-26 (D.C. Cir. 1984) (same).  The Court

need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an

inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n,

456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)

(internal quotation marks omitted).

---

[1] The Court has reviewed Plaintiffs' Complaint, Defendants' Motion to Dismiss, Plaintiffs' Opposition, and Defendants' Reply.  In addition, the Court held a hearing on July 22, 2011.

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of proving that the Court has subject matter jurisdiction to hear their claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens, 402 F.3d at  1253; see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case – a dismissal under Rule 12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings").

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  When the sufficiency of a complaint is challenged under Rule 12(b)(6), the factual allegations presented in it must be presumed true and should be liberally construed in plaintiff's favor.  Leatherman v. Tarrant Cty. Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993).  The notice pleading rules are "not meant to impose a great burden on a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and he or she must thus be given every favorable inference that may be drawn from the allegations of fact. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).  Although "detailed factual

allegations" are not necessary to withstand a Rule 12(b)(6) motion, <u>Twombly</u>, 550 U.S. at 555,

"a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (internal quotation

omitted).  Plaintiff must put forth "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." <u>Id.</u>  Though a plaintiff may

survive a 12(b)(6) motion even if "recovery is very remote and unlikely," <u>Twombly</u>, 550 U.S. at

555 (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint

"must be enough to raise a right to relief above the speculative level." <u>Id.</u> at 555.

## III.    Analysis

Defendants argue as a threshold matter that Plaintiffs' Complaint must be dismissed

because, under the Mine Act's exclusive administrative enforcement regime, this Court lacks

jurisdiction over each of Plaintiffs' claims.  Even if jurisdiction is proper, Defendants contend,

Plaintiffs have failed to plead facts sufficient to survive this Motion.  The Court will first address

Plaintiffs' constitutional claims.  Before discussing the merits, however, the Court will resolve

Defendants' jurisdictional argument.

### A.     <u>Due Process Claims</u>

#### 1.     *Rule 12(b)(1)*

According to Defendants, Plaintiffs' claims are nothing more than pre-enforcement

challenges that, under §§ 814, 815, and 816, are subject to the Mine Act's administrative review

process and thus the exclusive initial jurisdiction of the Federal Mine Safety and Health Review

Commission.  Plaintiffs respond that their claims may not properly be classified as either

enforcement or pre-enforcement, arguing that they "arise entirely outside of the enforcement

scheme" and are thus not subject to the Act's exclusive administrative review process.  Opp. at 6.

Instead of seeking this Court's review of any particular ventilation-plan dispute, Plaintiffs challenge the constitutionality of the administrative review process for ventilation-plan disputes <u>as a whole</u> – claims over which Plaintiffs assert this Court has jurisdiction.

To determine whether a court's jurisdiction is limited by an administrative review process, that court must consider first, whether the statute at issue in fact provides an exclusive administrative review scheme, and second, whether the claims at issue are of the type that Congress intended to fall within that scheme.  <u>See</u> <u>Sturm, Ruger & Company, Inc. v. Chao</u>, 300 F.3d 867, 871 (D.C. Cir. 2002) (citing <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200, 212 (1994)).  As a general matter, "when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems,' those procedures 'are to be exclusive.'" <u>Free Enterprise Fund v. Public Company Accounting Oversight Board</u>, 130 S. Ct. 3138, 3150 (2010) (quoting <u>Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.</u>, 379 U.S. 411, 420 (1965)).  As the Supreme Court reaffirmed last year, however, "[p]rovisions for agency review do not restrict judicial review unless the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure." <u>Id.</u> (quoting <u>Thunder Basin</u>, 510 U.S. at 207, 212 (1994) (internal citations omitted)).  "Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." <u>Thunder Basin</u>, 510 U.S. at 207 (internal citations omitted).  Courts "presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's

expertise." <u>Free Enterprise Fund</u>, 130 S. Ct. at 3150 (quoting <u>Thunder Basin</u>, 510 U.S. at 212-13 (internal citations omitted)).

Neither party disputes, and the language of the statute along with the Supreme Court's decision in <u>Thunder Basin</u> make clear, that the Mine Act creates an exclusive administrative review procedure for ordinary pre- and post-enforcement challenges to the Act.  Section 814 requires the Secretary of Labor to issue a citation "with reasonable promptness" whenever he "believes that an operator of a coal . . . mine . . . has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter . . . ." Upon receiving a citation, a mine operator must, within 30 days, decide whether to contest the citation.  § 815(a).  After 30 days, an uncontested "citation and the proposed assessment of penalty shall be deemed a final order of the Commission and not subject to review by any court or agency."  <u>Id.</u>  A mine operator wishing to contest a citation must notify the Secretary of his intent to do so, after which "the Secretary shall immediately advise the Commission of such notification, and the Commission shall afford an opportunity for a hearing."  § 815(d).  Appeals from the Commission are made directly to the U.S. Court of Appeals.  § 816(a)(1).

In <u>Thunder Basin</u>, the Supreme Court considered an attempt by a mine operator to circumvent the Mine Act's administrative review process by seeking an injunction against MSHA's enforcement of § 813 before the agency issued a citation for the operator's violation of the Act.  The Supreme Court held that "the statutory-review scheme in the Federal Mine Safety and Health Amendments Act of 1977 . . . prevents a district court from exercising subject-matter jurisdiction over a pre-enforcement challenge to the Act."  510 U.S. at 202.  "The Act's comprehensive review process does not distinguish between preenforcement and

postenforcement challenges," the Supreme Court found, "but applies to all violations of the Act and its regulations."  Id. at 208-09 (citing § 815(a)).

Not all claims relating to the Mine Act, however, necessarily fall within the Act's administrative review scheme.  The Supreme Court reaffirmed in Thunder Basin that district courts retain jurisdiction "over claims considered 'wholly "collateral"' to a statute's review provisions and outside the agency's expertise, . . . particularly where a finding of preclusion could foreclose all meaningful judicial review."  Id. at 212-13 (internal citations omitted).

A fundamental dispute in the present case is whether Plaintiffs' claims "are of the type Congress intended to be reviewed within [the Mine Act's] statutory scheme," or whether they are wholly collateral to that scheme.  Id. at 212.  Defendants contend that Plaintiffs' claims are "garden-variety" pre-enforcement challenges to the Act and thus within the Commission's exclusive jurisdiction.  Reply at 9.  As the facts of this case should not be distinguished from those underlying the decision in Thunder Basin, Defendants argue, this Court must similarly dismiss Plaintiffs' claims for want of jurisdiction.

Thunder Basin involved a dispute over § 813(f) of the Mine Act and a corresponding regulation, which permit employees of a mine to select a representative to accompany the Secretary of Labor during inspections of the mine and to obtain certain health and safety information.  510 U.S. at 203.  Once the mine employees designate their representative, the mine operator is required, under 30 CFR § 40.4, to post at the mine information regarding these designees.  Id. at 203-04.  When Thunder Basin Coal Company's non-union employees selected two non-employee members of the United Mine Workers of America as their representatives, the Company refused to post the information about these designees.  Id. at 204.  The MSHA district manager issued the Company a letter instructing it to post the miners' designated representatives.

Id.  Before MSHA could issue a citation for the violation, the Company filed suit in U.S. District

Court seeking pre-enforcement injunctive relief, on the ground that the designation of non-

employee UMWA representatives violated the Company's rights under the National Labor

Relations Act.  Id. at 205.  The Company argued that "requiring it to challenge the MSHA's

interpretation of 30 U.S.C. § 813(f) and 30 CFR pt. 40 through the statutory-review process

would violate the Due Process Clause of the Fifth Amendment, since the company would be

forced to choose between violating the Act and incurring possible escalating daily penalties, or,

on the other hand, complying with the designations and suffering irreparable harm."  Id.

    In determining that the district court lacked jurisdiction over Thunder Basin's claim for

injunctive relief, the Supreme Court considered the legislative history of the Mine Act, with

special attention to the 1977 amendments: "Congress expressed particular concern that under the

previous Coal Act mine operators could contest civil-penalty assessments *de novo* in federal

district court once the administrative review process was complete, thereby 'seriously

hamper[ing] the collection of civil penalties.'"  Id. at 210-11 (citation to the Mine Act's

legislative history omitted).  "We consider the legislative history and these amendments to be

persuasive evidence that Congress intended to direct ordinary challenges under the Mine Act to a

single review process."  Id. at 211 (emphasis added).

    The procedural posture of Plaintiffs' claims can be distinguished from Thunder Basin's

claim for injunctive relief.  Sections 814 and 815 provide that mine operators who violate the Act

receive citations that they must contest, if at all, before the Commission.  As Plaintiffs point out,

they have not committed a violation of the Act at all, let alone received a citation for violating it.

See Opp. at 11.  They will not, consequently, receive the citation that would allow them access to

the Commission and the hearing that they seek, thus foreclosing "'meaningful judicial review.'"

<u>Thunder Basin</u>, 510 U.S. at 213 (quoting <u>McNary v. Haitian Refugee Center, Inc.</u>, 498 U.S. 479, 496 (1991)).  Defendants argue that all Plaintiffs need do to receive a hearing is to ask for a citation; such "technical violation" of the Act would, according to them, trigger the Commission's jurisdiction.  Mot. at 18.  This implies that Plaintiffs' suit here refers to particular unresolved disputes or redress for a specific mine-ventilation plan.  On the contrary, through Counts I, III, and V, Plaintiffs ask the Court not to resolve individual plan disputes, but to answer broad constitutional questions about whether the Commission's review process itself affords them the process they are due under the Fifth Amendment.  As Plaintiffs do not contest any civil penalty or order of the Agency, furthermore, this Court's review of Plaintiffs' constitutional claims would not hamper the collection of civil penalties or the Agency's enforcement of the Act.

A finding of jurisdiction, moreover, would be consistent with decisions since <u>Thunder Basin</u> from the Supreme Court and our Court of Appeals, which have upheld district court jurisdiction over broad constitutional challenges to other statutes with exclusive administrative enforcement regimes.  While the outcomes in cases like these rest largely on the language of the statutes at issue, the precedents are nevertheless instructive.

<u>Free Enterprise Fund</u> presented a clear example of a "wholly collateral" challenge to the Sarbanes-Oxley Act of 2002.  130 S. Ct. 3138.  That act created the Public Company Accounting Oversight Board, comprised of members appointed by the Securities and Exchange Commission, with broad administrative and enforcement powers to, for example, promulgate rules, conduct investigations, initiate disciplinary proceedings, and impose sanctions for violations of the Securities Exchange Act of 1934.  <u>See id.</u> at 3147-48.  The Sarbanes-Oxley Act also established an administrative review structure that empowered the SEC to review Board-issued rules and

sanctions.  See id. at 3150.  Final orders of the Commission could be appealed directly to the

federal courts of appeals.  Id.  Free Enterprise Fund challenged the Sarbanes-Oxley Act on the

grounds that it contravened separation of powers by conferring wide-ranging executive power on

Board members without subjecting them to Presidential control and that it violated the

Appointments Clause of the Constitution.  Id. at 3149.

   The government argued lack of jurisdiction, claiming that Free Enterprise Fund should

have challenged the constitutionality of the Board by seeking Commission review of "the

Board's 'auditing standards, registration requirements, or other rules,'" or by incurring a sanction

by ignoring Board requests for documents and testimony in order to appeal the sanction to the

Commission.  Id. at 3150-51.  In upholding district court jurisdiction, the Supreme Court rejected

both of the government's suggestions, observing that Free Enterprise Fund "object[s] to the

Board's existence, not to any of its auditing standards" and concluding that its "general challenge

to the Board is 'collateral' to any Commission orders or rules from which review might be

sought."  Id. at 3150.  The Court further found, "[W]e do not consider this a 'meaningful avenue

of relief,'" noting, "We normally do not require plaintiffs to 'bet the farm . . . by taking the

violative action' before 'testing the validity of the law."  Id. at 3151 (quoting MedImmune, Inc.

v. Genentech, Inc., 549 U.S. 118, 129 (2007)).

   General Electric Company v. EPA, 360 F.3d 188 (D.C. Cir. 2004) (GE I), involved a

challenge to the Comprehensive Environmental Response, Compensation, and Liability Act's

(CERCLA) unilateral administrative order (UAO) regime, through which the EPA can order a

potentially responsible party to clean up a hazardous site, without benefit of a pre-clean-up

hearing and with sanctions for noncompliance, and only afterward seek to recoup its costs.  Id. at

189-90.  CERCLA § 113(h) "divests federal courts of jurisdiction to entertain 'any challenges to

removal or remedial action selected [by the EPA under CERCLA § 104] or to review any order

issued under [§ 106(a)]." Id. at 191 (quoting 42 U.S.C. § 9613(h)).  GE sought a "declaratory

judgment that the provisions of CERCLA relating to the unilateral administrative orders regime,

namely §§ 106(a), 107(c)(3), and 113(h), are unconstitutional under the Due Process Clause of

the Fifth Amendment." Id. at 190.  GE alleged that "the combination of the absence of pre-

enforcement review and massive penalties for noncompliance with a UAO 'imposes a classic

and unconstitutional Hobson's choice: Either do nothing and risk severe punishment without

meaningful recourse or comply and wait indefinitely before having any opportunity to be heard

on the legality and rationality of the underlying order.'" Id.

        The D.C. Circuit found that the language of § 113(h) did not bar GE's challenge to

CERCLA in district court. Id. at 191.  In enacting § 113(h), Congress, the court found, had only

limited federal court jurisdiction over two enumerated types of claims – challenges to § 104

actions and § 106 orders. Id.  The court concluded: "GE's due process challenge to CERCLA's

administrative orders regime is not a challenge to the way in which EPA is administering the

statute in any particular removal or remedial action or order, but rather is a challenge to the

CERCLA statute itself.  As such, GE's facial constitutional challenge does not fit within the

plain text of § 113(h)'s reference to 'any challenges . . . .'" Id. (emphasis added).

        In finding the district court had jurisdiction over GE's facial constitutional challenge, the

D.C. Circuit went further, opining, "Even if § 113(h) were ambiguous regarding constitutional

challenges, our holding that GE's constitutional challenge is not barred by § 113(h) would

comport with precedent distinguishing between facial, or 'systematic,' and as-applied, or

particularized challenges." Id. at 192 (citing Johnson v. Robison, 415 U.S. 361, 373-74 (1974)

16

(provision barring review of individual veterans' benefit determinations did not bar constitutional challenge to statute itself)).

In General Electric Company v. Jackson, 610 F.3d 110 (D.C. Cir. 2010) (GE II), the D.C. Circuit expanded its ruling in GE I to include GE's "pattern and practice" claim – that "EPA's policies and procedures for issuing UAOs exacerbate CERCLA's constitutional deficiencies." Id. at 116.  The D.C. Circuit drew its distinction between "collateral and particularized claims." Id. at 126.  The court wrote: "Section 113(h) is quite clear: it only prohibits district courts from reviewing UAOs before enforcement or reimbursement proceedings have been initiated. Nothing in the provision bars a pattern and practice challenge that seeks no relief with respect to any particular UAO.  To be sure, as EPA emphasizes, the district court did calculate a UAO error rate.  But significantly for the section 113(h) issue before us, GE sought no relief with respect to individual UAOs, nor did the district court grant any." Id. at 125.

GE II, the D.C. Circuit found, was controlled by the Supreme Court's decision in McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991).  Id. at 125.  In McNary, the Supreme Court held that "the plain language of the immigration statute [at issue] – which barred review 'of a determination respecting an application' for special agricultural worker (SAW) status, 8 U.S.C. § 1160(e)(1) – referred only to judicial review of 'a single act rather than . . . a practice or procedure employed in making decisions' . . . .  Thus, although the statute prohibited courts from reviewing denials of individual applications for SAW status, district courts could nonetheless consider 'general collateral challenges to unconstitutional practices and policies used by the agency in processing applications.'" Id.

The D.C. Circuit rejected EPA's reading of McNary to require that "plaintiffs like GE who seek to bring pattern and practice challenges first show that the statute provides no

meaningful judicial review for their claims." Id. at 125.  "Properly read," the court concluded, "McNary's conclusion that the immigration statute's jurisdiction-stripping provision presented no bar to a pattern and practice suit did not depend on the unavailability of alternative means of judicial review.  Instead, it rested entirely on the Court's analysis of the jurisdictional provision's text: 'Given Congress' choice of statutory language, we conclude that challenges to the procedures used by INS do not fall within the scope of [the jurisdictional bar].  Rather, we hold that [that provision] applies only to review of denials of individual SAW applications.'" Id. at 126.

Plaintiffs are correct that their constitutional due process claims in the present case, like those in Free Enterprise Fund, McNary, and GE I and II, present broad facial and systemic challenges that fall outside the Mine Act's statutory review scheme.  Section 815 describes the review procedure a mine operator must follow to contest "the issuance or modification of an order[,] . . . citation[,] . . . notification of proposed assessment of a penalty[,] . . . or the reasonableness of the length of abatement time fixed in a citation," in connection with a "violation" of the Act.  Nothing in the language of §§ 814, 815, 816, or 823 precludes broad constitutional due process challenges to the facial validity of the Mine Act's procedures for adjudicating ventilation-plan disputes, or to MSHA's polices and practices for administering these procedures, divorced from any individual ventilation-plan dispute.

For these reasons, the D.C. Circuit's decision in Sturm, Ruger & Company, Inc. v. Chao, 300 F.3d 867 (D.C. Cir. 2002), provides Defendants no support.  Sturm Ruger involved the comprehensive administrative review structure created by the Occupations Safety and Health Act (OSHA).  OSHA propounded a survey designed to collect information about workplace health and safety, which Sturm Ruger completed.  Id. at 869.  Based on the information provided in the

18

survey, OSHA sent inspectors to a Sturm Ruger facility, where they were denied entrance.  Id.

OSHA obtained a warrant and later issued Sturm Ruger citations for violations of safety and

health standards discovered during the ensuing inspection.  Id.  Sturm Ruger challenged the

citations through OSHA's administrative review scheme and moved to suppress the evidence

obtained during the inspection, "arguing that no regulation authorized OHSA to collect the

survey data that it used to target employers for inspection, and that the use of the data violated

the Fourth Amendment."  Id. at 870.  While Sturm Ruger's administrative challenge was still

pending before the Occupational Safety and Health Review Commission, the company filed a

parallel action in federal district court seeking "both a declaratory judgment and an injunction

barring OSHA from compelling compliance with the DCI survey, from conducting inspection

programs that rely on survey data, and from 'pursuing enforcement proceedings under the

unlawful targeting inspection programs.'"  Id. (citation omitted).

        Significantly and unlike Plaintiffs in the present case, Sturm Ruger did "'not suggest[]

that its claims [could not]  be adequately adjudicated in the  . . . anticipated enforcement

proceeding.'"  Id. at 869.  Instead, like Thunder Basin, the D.C. Circuit found that Sturm Ruger

sought to short-circuit the administrative process through the vehicle of a district court

complaint.  Id. at 876 (distinguishing Sturm Ruger from National Mining Ass'n v. Department of

Labor, 292 F.3d 849 (D.C. Cir. 2002), holding that, notwithstanding the rule of Thunder Basin, a

district court had jurisdiction to hear a "generic" challenge to regulations issued under the Black

Lung Benefits Act).

        In finding jurisdiction here, the Court does not deny that the Commission may

occasionally address constitutional questions in individual enforcement proceedings, see

Thunder Basin, 510 U.S. at 215, such as where a mine operator contests a citation on the ground

that the regulation he was cited for violating was unconstitutional.  In addition, the presence of a constitutional claim alone will not convert an enforcement dispute under the Mine Act into a federal case.  The Supreme Court in <u>Thunder Basin</u>, however, was careful to note that "petitioner expressly disavows any abstract challenge to the Mine Act's statutory review scheme, but limits its due process claim to the present situation where the Act allegedly requires petitioner to relinquish an independent statutory right." <u>Id.</u> at 218 n.22.

Unlike <u>Sturm Ruger</u> and <u>Thunder Basin</u>, Plaintiffs in the present case, through their facial and pattern-and-practice due process claims, present broad, systemic constitutional challenges to the Mine Act and MSHA's administration of it that are not tied to any individual enforcement challenges and through which Plaintiffs do not seek redress for any individual ventilation-plan disputes.  The language of the statute does not prohibit Plaintiffs from bringing these claims in this Court; they are not claims of the type that Congress intended to be heard exclusively through the Mine Act's administrative review process; and, if Plaintiffs are correct that the Mine Act provides no dispute-resolution process when their ventilation-plan negotiations are at an impasse, they are claims for which Plaintiffs will be denied all judicial review if this Court lacks jurisdiction.  As a result, jurisdiction over Plaintiffs' constitutional challenges in Counts I, III, and V is proper.  The Court will now turn to the merits of those claims.

> 2.    *Rule 12(b)(6)*

In addition to contesting jurisdiction, Defendants have also vigorously disputed the merits of Plaintiffs' constitutional claims.  Plaintiffs here have brought both a facial constitutional challenge, as well as as-applied or pattern-and-practice challenges.  The Court will consider them separately.

a.      Facial Challenge (Count I)

Although the parties did not agree whether jurisdiction was proper here, they do concur

that if jurisdiction exists for Count I – Plaintiffs' facial constitutional challenge to the Mine Act –

the question is now ripe for this Court's review and no discovery is necessary.  Hearing Tr. at

11:24-25.  Plaintiffs' facial challenge is brought under the Fifth Amendment and asserts a denial

of procedural due process.  More concretely, Plaintiffs point to the absence of dispute-resolution

procedures for ventilation-plan disputes.

A "'facial challenge to a legislative Act is, of course, the most difficult challenge to

mount successfully.'"  GE II, 610 F.3d at 117 (quoting United States v. Salerno, 481 U.S. 739,

745 (1987)).  "Although the precise standard for facial challenges remains 'a matter of dispute,'

United States v. Stevens, __ U.S. __, 130 S. Ct. 1577, 1587 (2010), to prevail [a plaintiff] must

establish either "'that no set of circumstances exists under which [the Mine Act's dispute-

resolution procedures] would be valid," or that [those provisions] lack [ ] any "plainly legitimate

sweep."'"  Id. (quoting Salerno, 481 U.S. at 745, and Washington v. Glucksberg, 521 U.S. 702,

740 n.7 (1997) (Stevens, J., concurring in the judgments) (citations omitted)).

The Due Process Clause of the Fifth Amendment mandates, "No person shall  . . . be

deprived of life, liberty, or property, without due process of law."  The first inquiry in every due

process challenge is "whether the plaintiff has been deprived of a protected interest in 'liberty' or

'property.'  Only after finding the deprivation of a protected interest do we look to see if the

[government's] procedures comport with due process.'"  GE II at 117 (quoting Amer. Mfrs. Mut.

Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999).  At this second step, "we apply the now-familiar

Matthews v. Eldridge balancing test, considering (1) the significance of the private party's

protected interest, (2) the government's interest, and (3) the risk of erroneous deprivation and

21

'the probable value, if any, of additional or substitute procedural safeguards.'" Id. (quoting

Matthews v. Eldridge, 424 U.S. 319, 335 (1976)).

The parties hotly contest the question of whether Plaintiffs have adequately pled a

protected property interest.  In their Complaint, Plaintiffs allege: "When in the course of a

ventilation plan approval process MSHA refuses to approve the Plaintiffs' ventilation plans, or

conditions approval of such plans on arbitrary grounds, the Plaintiffs are deprived of their

constitutionally protected interests in a safe and healthy workforce, the economic viability of

their operations, and the right to develop and implement ventilation plans suitable to their

particular mine."  Compl., ¶ 61.  Although the Supreme Court has suggested that mine operators

may possess some private property interests, see Thunder Basin, 510 U.S. at 217 n.21, as in other

highly regulated industries, "Congress' interest in regulating the mining industry may justify

limiting the private property interests of mine operators."  Id.

The Court need not decide now whether Plaintiffs have in fact suffered a deprivation of a

protected property interest.  Even if they could so prove, they cannot show that there exists no set

of circumstances in which the government's procedures for resolving and reviewing mine-

ventilation-plan disputes comport with due process.

In Count I, Plaintiffs allege one primary due process deficiency with the Mine Act's

ventilation-plan approval process – namely, that the "Mine Act does not provide for any dispute-

resolution procedure with respect to ventilation plan approvals in the event the Plaintiffs and

MSHA reach an impasse regarding one or more plan provisions[,] . . . or MSHA refuses to

approve a submitted plan or adopts an arbitrary position with respect to the plan that is based on

generic beliefs unrelated to the specific conditions or mining system at the mine . . . ."  Compl., ¶

62.

22

Defendants dispute Plaintiffs' assertion that mine operators have access to no dispute-resolution process to redress their grievances stemming from MSHA's conduct during the ventilation-plan approval process.  When a mine operator and MSHA "reach an impasse concerning one or more ventilation plan provisions[,] . . . the operator may initiate the administrative review process [§§ 815 and 816] by refusing to adopt the plan and requesting that the Secretary issue a citation for what is known as a 'technical violation.'"  Mot. at 5.  By seeking a "technical citation" from the agency, Plaintiffs can convert a dispute over a mine-ventilation plan into an enforcement action in order to obtain administrative and, eventually, judicial review.

Plaintiffs respond that the "technical violation" avenue to review in ventilation-plan disputes is "a fiction" that cannot provide meaningful relief.  Opp. at 23-24.  They suggest three primary arguments for why MSHA's technical-violation review procedures fail to comport with due process.  First, Plaintiffs argue that because the Mine Act itself does not explicitly authorize the Commission to hear ventilation-plan disputes, these disputes are outside the Commission's jurisdiction.  Id. at 26.  Plaintiffs "recognize that the Commission has, on occasion, assumed jurisdiction over 'plan disputes' through the 'technical violation' process described by MSHA."  Id. (citing C.W. Mining, 18 FMSHRC 1740, 1747 (Oct. 1996)).  "But that only means," Plaintiffs argue, that "the practice has not been subjected to judicial scrutiny."  Id.  Here Plaintiffs are wrong.

Although not explicitly considering whether they comport with the Due Process Clause, the D.C. Circuit has referred with approval to MSHA's ventilation-plan approval and review procedures, and, describing the path to administrative review very like MSHA's "technical violation" option, determined that the Mine Act strikes an appropriate balance in ventilation-plan

negotiations between a mine operator and MSHA.  In Zeigler Coal Co., that court considered

whether permitting MSHA to enforce ventilation plans as mandatory health and safety standards

would allow the Agency to circumvent the rigorous procedures it must follow under § 101 to

pass such standards.  In other words, the Plaintiff there challenged MSHA's ability to simply

insist on the inclusion of the new standards in the various mine plans operators must adopt.  536

F.2d at 407.  The D.C. Circuit dismissed the plaintiffs' fears of "mine inspectors run riot,

ignoring the § 101 procedures and simply insisting that newly formulated standards be included

in one or another of the plans each operator must adopt."  Id. at 406.  "Because we read the

statute as placing quite narrow limits on the subject matter properly treated in ventilation plans,

and because the operator has a mechanism available to assure that plans do not exceed these

limits, we conclude that enforcing duly adopted ventilation plans poses no threat to the continued

vitality of § 101."  Id. (emphasis added).

The Zeigler Court described the limits on MSHA's control over the content of mine-

ventilation plans, as well as an appeal mechanism like the one Defendants point to in the present

case: "While the plan must also be approved by the Secretary's representative, who may on that

account have some significant leverage in determining its contents, it does not follow that he has

anything close to unrestrained power to impose terms.  For even where the agency representative

is adamant in his insistence that certain conditions be included, the operator retains the option to

refuse to adopt the plan in the form required."  Id. at 406-07.  "The agency's recourse to such a

refusal to adopt a particular plan appears to be the invocation of the civil and criminal penalties

of [§ 814], which require an opportunity for public hearing and, ultimately, appeal to the courts."

Id. at 407.  An "[a]ttempted inclusion of [particular plan provisions] could be successfully

contested by the operator in an enforcement action brought by the Secretary."  Id.  "Thus an

24

operator might contest an action seeking to compel adoption of a plan, on the ground that it contained terms relating not to the particular circumstances of his mine, but rather imposed requirements of a general nature which should more properly have been formulated as a mandatory standard, under the provisions of [§ 811]." Id.

While Zeigler supports Defendants' argument that there has been judicial scrutiny, Defendants also maintain that current practice demonstrates that due process is afforded.  They point to numerous cases before the Commission and on appeal before the D.C. Circuit, in which parties followed MSHA's recommended course of action in this case: incurring a citation for operating a mine without an approved plan for just long enough to contest the resulting citation and then seeking relief in the underlying plan dispute from the Commission.

For example, in Secretary of Labor v. Carbon County Coal Co., 7 FMSHRC 1367 (1985), the Commission observed:

> The requirement that the Secretary approve an operator's mine ventilation plan does not mean that an operator has no option but to acquiesce to the Secretary's desires regarding the contents of the plan.  Legitimate disagreements as to the proper course of action are bound to occur.  In attempting to resolve such differences, the Secretary and an operator must negotiate in good faith and for a reasonable period concerning a disputed provision.  Where such good faith negotiation has taken place, and the operator and the Secretary remain at odds over a plan provision, review of the dispute may be obtained by the operator's refusal to adopt the disputed provision, thus triggering litigation before the Commission.

Id. at 1371.  The Commission there reviewed the facts of the parties' negotiations, the ventilation-plan proposals, and the particular circumstances present at the mine in question, ultimately determining that "MSHA's decision . . . was not based upon particular circumstances at the [mine], but rather was imposed as a general rule applicable to all mines."  Id. at 1375. Thus, the Commission found, "MSHA's insistence upon the [additional] provision, MSHA's

revocation of Carbon County's ventilation plan, and MSHA's subsequent citation of Carbon County for a violation of section 75.316 were not in accord with applicable Mine Act procedure."  Id.

Similarly, in Secretary of Labor v. Peabody Coal Co., 18 FMSHRC 686 (1996), when the Secretary refused to approve a ventilation plan for Peabody's mine that did not contain a particular provision, Peabody apparently continued to operate its mine without an approved plan. Id. at 687-88.  MSHA then issued Peabody a citation for so operating.  Id. at 688.  Peabody "submitted, under protest, a plan containing the provision required by the Secretary" and then "filed a notice of contest and a hearing was held."  Id.  The Commission concluded that "substantial record evidence supports the [administrative law] judge's finding that the previously approved plan was unsuitable and the new provision was suitable to conditions at the Martwick Mine."  Id. at 691.

Peabody appealed the Commission's ruling to the District of Columbia Circuit.  Peabody Coal Co. v. Federal Mine Safety and Health Review Commission, 111 F.3d 963 (D.C. Cir. 1997).  The D.C. Circuit described the posture of the case thus: "Petitioner Peabody Coal Company seeks review of the decision of the Federal Mine Safety and Health Review Commission accepting the Mine Safety and Health Administration's decision not to approve any ventilation plan for the Martwick mine . . . that did not provide for ventilation during roof bolting."  Id. at 963.  Peabody alleged that "the MSHA imposed this requirement without affording adequate consideration to whether the requirement is 'suitable' to the particular conditions in the mine[, and] . . . contend[ed] that the agency instead based its decision upon conditions and considerations that are common to all mines and should therefore have initiated a rulemaking."  Id.  The D.C. Circuit observed that "the MSHA is free to regulate in an

26

adjudicatory proceeding a risk that may be common to a large number of mines provided that an identifiable attribute of the particular mine being regulated is shown to give rise to that risk," and applied the APA, 5 U.S.C. § 706(2)(A), to find that MSHA did not act arbitrarily or capriciously when deciding to apply that requirement to Peabody's mine.  Id.  The D.C. Circuit's decisions in Zeigler and Peabody thus indicate that the Commission can and does hear mine-ventilation-plan disputes in the context of enforcement actions.

Plaintiffs' second argument relates to the manner in which disputes are resolved.  They argue that they cannot be required to violate the law – as they must at least declare their intent to do in order to receive a citation under MSHA's "technical violation" procedures – so that they may get their grievance heard by the Commission.  Opp. at 24 (citing Free Enterprise Fund, 130 S. Ct. at 3150).  Free Enterprise Fund, Plaintiffs argue, stands for the proposition that an administrative regime that requires them to incur a citation in order to challenge the validity of a statute does not afford meaningful review.  Id.; 130 S. Ct. at 3150-51 (quoting MedImmune, Inc., 549 U.S. at 129; Thunder Basin, 510 U.S. at 212)).

In MedImmune Inc., the Supreme Court explained: "Our analysis must begin with the recognition that, where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced.  The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction."  549 U.S. at 128-29 (emphasis deleted).

Free Enterprise Fund and MedImmune derive from the Supreme Court's long standing holding in Ex Parte Young, 209 U.S. 123 (1908).  "Under Ex Parte Young and its progeny, a statutory scheme that imposes penalties on those seeking judicial review is unconstitutional if

'the penalties for disobedience are by fines so enormous . . . as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation.'"  General Electric Co. v. Jackson, 595 F. Supp. 2d 8, 17 (D.D.C. 2009) (quoting 209 U.S. at 147).  "Statutes prescribing significant penalties for violators are not per se unconstitutional, however.  Rather, if a party challenging a penalty or a statute in 'good faith' may not be penalized, then the statute may be constitutional under Ex Parte Young."  Id. (citing Reisman v. Caplin, 375 U.S. 440, 446-47 (1964)).

In the present case, Ex Parte Young does not render MSHA's technical-violation review process for mine-ventilation-plan disputes unconstitutional.  Plaintiffs conceded that for a mine operator who obtains a technical citation to obtain review of a plan dispute, but ultimately loses before the Commission and the Court of Appeals, because "it's been a cooperative process [with MSHA], the penalties probably usually are fairly small.  It is not meant to be punitive."  Hearing Tr. at 9:6-9.  Plaintiffs do not suggest that, for those mine operators who succeed in obtaining technical violations, "the penalties for [refusing to adopt MSHA's suggested plan provisions] are by fines so enormous . . . as to intimidate the company" from seeking review.  Ex Parte Young, 209 U.S. at 147.

But even if the fines were sufficiently large to raise concerns under Ex Parte Young, as Plaintiffs suggest they might be if the citation is not for a "technical violation," but rather for an intentional violation of the Mine Act, the Supreme Court in Thunder Basin explicitly addressed and dismissed this concern on the ground that the statute afforded mine operators sufficient procedural safeguards.  See 510 U.S. at 218.  The Thunder Basin Court first explained the procedures in that case:

> Nor will petitioner face any serious prehearing deprivation if it refuses to post the designations while challenging the Secretary's

28

> interpretation [of § 813].    Although the Act's civil penalties
> unquestionably may become onerous if petitioner chooses not to
> comply, the Secretary's penalty assessments become final and
> payable only after full review by both the Commission and the
> appropriate court of appeals.  30 U.S.C. §§ 820(i) and 816.  A mine
> operator may request that the Commission expedite its proceedings,
> § 815(d), and temporary relief of certain orders is available from the
> Commission and the court of appeals.  §§ 815(b)(2) and 816(a)(2).

Id. at 217-18.  The Supreme Court then concluded, "[T]his case does not present the situation

confronted in Ex Parte Young, . . . in which the practical effect of coercive penalties for

noncompliance was to foreclose all access to the courts.  Nor does this approach a situation in

which compliance is sufficiently onerous and coercive penalties sufficiently potent that a

constitutionally intolerable choice might be presented."  Id. at 218.  It is equally true in this case

that the technical-violation citation procedure does not result in coercive penalties or deprive

Plaintiffs of court access.

Plaintiffs' third and final complaint is that the technical-citation process is found only in

MSHA's policy guidelines and is not codified in any statute or regulation; it is thus not binding

on the Agency.  Opp. at 27 (citing Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 537

(D.C. Cir. 1986)).  Given its non-binding status, Plaintiffs assert that they cannot rely on the

technical-citation procedure as an avenue of review.  Id.  Because "MSHA will only issue a

citation for a 'technical violation' if it agrees with the operator that negotiations are at an

impasse," a mine operator cannot always reach the Commission in an expeditious manner

without incurring steeper penalties for a "willful" violation.  Id. at 28-29.

This argument, however, does not belong in Plaintiffs' facial challenge, as it raises

factual questions about how the Agency actually administers the Mine Act – questions that are

more properly considered in an as-applied challenge.  Plaintiffs must show that "no set of

circumstances exists" in which the Mine Act's review procedures for ventilation-plan disputes

are constitutional; as such, they cannot carry their burden by proving that in <u>some</u> circumstances MSHA refuses to follow its policy of giving citations for "technical violations" or prevents a mine operator from timely reaching the Commission.

Because the Court therefore finds that the Mine Act is facially constitutional, Count I will be dismissed.

b.      Pattern-and-Practice Challenge (Counts III and V)

Although the Court finds that the Mine Act is facially constitutional, Plaintiffs maintain, in the alternative, that MSHA has a pattern and practice of <u>administering</u> the Act in such a way as to deny them procedural and substantive due process.  Plaintiffs identify these claims as as-applied constitutional challenges, but stress that they are "broader than just a single one-off plan dispute," and instead concern "how the agency interfaces with the regulated community" "consistently throughout dealings with plan disputes."  Hearing Tr. at 13:14-25.  As with Count I, Defendants move to dismiss the pattern-and-practice claims under Rule 12(b)(6) on the grounds that Plaintiffs fail to plead both the deprivation of any protected property interest and the actual denial of due process.  Mot. at 21, 27.

In evaluating Defendants' challenge to Counts III and V, the Court must accept all well-pled facts in Plaintiffs' Complaint as true and give them the benefit of all reasonable inferences that can be drawn therefrom.  To support their allegations that they have been deprived of a protected property interest in Counts III and V, Plaintiffs plead the same facts as in Count I. Specifically, Plaintiffs allege: "When in the course of a ventilation plan approval process MSHA refuses to approve the Plaintiffs' ventilation plans, or conditions approval of such plans on arbitrary grounds, the Plaintiffs are deprived of their constitutionally protected interests in a safe and healthy workforce, the economic viability of their operations, and the right to develop and

implement ventilation plans suitable to their particular mine."  Compl., ¶ 61; see also, id., ¶¶ 59,

70, 81.

As Plaintiffs point out, the "'types of interests protected as property are varied and, as

often as not, intangible, relating to the whole domain of social and economic fact.'"  Opp. at 33

(quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 430-31 (1982)).  Given the liberal

pleading requirements of Rule 8, and the fact-based nature of the inquiry, this Court cannot say

now, as a matter of law, that Plaintiffs have failed to plead the deprivation of a protected

property interest.  After discovery and a further factual fleshing out of the issue, the Court will be

better able to determine whether MSHA has deprived them of a legitimate protected property

interest.

Plaintiffs have similarly pled sufficient facts in support of their contention that MSHA's

procedures do not "comport with due process" to survive Defendants' Motion to Dismiss and

reach discovery regarding MSHA's alleged pattern and practice of unconstitutionally

administering their ventilation-plan dispute-resolution polices.  See GE II, 610 F.3d at 117.

Plaintiffs plead that "Defendants have through a pattern and practice repeatedly failed to afford

the Plaintiffs the process due under the Mine Act inasmuch as it has systematically, and without

regard to the conditions and mining system of the individual mines, disapproved or failed to

approve the Plaintiffs' ventilation plans unless and until the Plaintiffs have implemented the

Defendants' demands that, *inter alia*, they not use scrubbers at their mines, [and] they only use

exhausting ventilation systems . . . ."  Id., ¶ 74.

Defendants complain that Plaintiffs do not plead more specific facts about individual

ventilation plans that they believe MSHA negotiated unlawfully: "Noticeably absent from the

Complaint are any specific allegations of fact concerning Defendants' supposed violations of

Plaintiffs' rights.  The Complaint does not identify by date, case number, or any other descriptor the submissions allegedly submitted by Plaintiffs to which the Complaint is supposed to relate." Mot. at 9-10.  If Plaintiffs sought relief from the Court with respect to any of these individual ventilation-plan disputes, the Court could well find the lack of specificity in Plaintiffs' Complaint concerning.  But Plaintiffs notably seek no such relief; rather, they seek only a declaratory judgment that Defendants' general handling of Plaintiffs' ventilation plans denies them due process.

With respect to the process Plaintiffs claim they are due, they plead that generally, "'due process' requires that a party be given a hearing before being deprived of a liberty or property interest by the federal government.  . . .  Such process typically means a hearing at which the legal basis for the government's action can be evaluated, challenged, and judged, and the aggrieved party made whole if it prevails."  Compl., ¶ 71.  "The Mine Act," Plaintiff allege, "affords no such protections to operators with respect to the ventilation plan approval process and any disputes arising from that process between the operator and MSHA."  Id., ¶ 72.

Defendants argue that the premise of Plaintiffs' claims alleging the "lack of a dispute-resolution procedure under the Mine Act" for ventilation-plan disputes is "verifiably incorrect." Mot. at 17-18.  They chide Plaintiffs for failing to acknowledge in their Complaint the ability of mine operators to obtain administrative review from the Commission in a ventilation-plan dispute by "simply request[ing] entry of a technical violation."  Id. at 18.  Plaintiffs respond that as the "technical violation" procedure is described only in MSHA's Policy Manual – and not codified in statute or regulation – it cannot provide meaningful relief because "MSHA is not bound to comply with its policy."  Opp. at 27-28.  More significantly, they claim MSHA routinely does not comply.

This Court granted Defendants' Motion to Dismiss Count I because there exist circumstances in which the Mine Act can be applied constitutionally – for example, when MSHA responds to a dispute with a mine operator over a ventilation plan by issuing a citation and giving the operator access to the Commission and then judicial review.  See, e.g., Zeigler, 536 F.2d at 407-08.  Yet Plaintiffs' pattern-and-practice claims allege that, as a matter of course, MSHA fails to apply the Mine Act in such a constitutional manner.

At the hearing, counsel for Plaintiffs conceded, "[I]f I accept for the sake of argument that we have the right to go to the Commission to be heard on these disputes, then we lose." Hearing Tr. at 38:14-16.  "But," he argued, "that has to be a guaranteed right.  And the absence of the guaranteed right is the l[i]nchpin to our case."  Id. at 38:14-18.  Nothing in the administrative review scheme described in §§ 815, 816, and 823 of the Act, Plaintiffs plead in their Complaint, provides a "dispute resolution procedure to resolve disputes over ventilation plans submitted for approval or recourse if MSHA acts arbitrarily, unlawfully, or ultra vires with respect to such plans," because "MSHA is free, over the mine operator's objection, to do literally nothing in response to a ventilation plan submitted for its approval, or may adopt a blanket and arbitrary position that does not take into consideration the specific conditions" at an individual mine.  Compl., ¶ 42.

From the facts pled in Plaintiffs' Complaint, this Court can reasonably infer that Plaintiffs are claiming, as they suggested at the hearing, that "because there is nothing that compels MSHA to issue that [technical] citation, if they don't feel that you are at an impasse" in the plan negotiation process, they can – and consistently do – decline to issue a technical citation, resulting in Plaintiffs being denied the process they are due.  Hearing Tr. at 10:5-10.

As Plaintiffs point out in their Opposition, "the balance of the classic due process analysis set out in <u>Matthews v. Eldridge</u> is fact-dependent and cannot be decided at this juncture."  Opp. at 41.  The Court does not attempt to apply this test at the present time, but finds only that, viewing the Complaint in the light most favorable to Plaintiffs, they have alleged facts sufficient to survive Defendants' Motion to Dismiss their pattern-and-practice claims.[2]

B.      The APA and *Ultra Vires* Conduct (Counts VI and IV)

Plaintiffs also allege two counts not based on the Due Process Clause of the Fifth Amendment – claims that Defendants have violated the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and acted *ultra vires*, in excess of their statutory authority.  Defendants move to dismiss both these counts as well on the grounds that <u>Thunder Basin</u> precludes this Court's jurisdiction over them and that Plaintiffs have failed to allege facts sufficient to support their claims.

Section 706 of the APA empowers courts to "(1) compel agency action unlawfully withheld or unreasonably delayed" and "(2) hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; or (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ."

In order to properly state a claim under the APA, however, Plaintiffs must first identify the final agency action being challenged.  5 U.S.C. § 704 (judicial review is limited to agency action made reviewable by statute and "final agency action for which there is no other adequate remedy in court").  The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

---

[2] Because the Court denies Defendants' Motion with respect to Counts III and V, Plaintiffs' corresponding Declaratory Judgment Act claim, Count VII, also survives.

§ 551(13).  Final agency action must "mark the consummation of the agency's decision-making process, and must either determine rights or obligations or occasion legal consequences."  Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 482 (2004) (internal quotations omitted).

Defendants argue that Plaintiffs' APA claim must be dismissed because it fails to identify one or more final agency actions that Plaintiffs ask this Court to review under § 706.  Mot. at 32. Defendants are correct that, "[u]nder the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm," rather than seeking "wholesale improvement" of an agency program "by court decree, rather than in the offices of the [agency] or the halls of Congress, where programmatic improvements are normally made."  Lujan v. National Wildlife Federation, 497 U.S. 871, 891 (1990) (emphasis deleted).

In support of their APA claim, Plaintiffs allege that "[e]ach instance of the Defendants . . . denying the Plaintiffs the right to ventilate their respective mines in a manner consistent with prudent mining engineering and safety and health practices suitable to the conditions and mining systems at those mines constitutes a final agency action reviewable by this Court under the APA, 5 U.S.C. § 706."  Compl., ¶ 85.  Plaintiffs further allege that "Defendants have repeatedly and systematically refused to consider the conditions and mining systems of the Plaintiffs' mines in prohibiting the Plaintiffs from[, for example,] using scrubbers at their mines, [and] prohibiting the Plaintiffs from using blowing ventilation systems."  Id., ¶ 86.  Plaintiffs assert first, that "[s]uch a generic, one-size-fits all approach to ventilation plan review is arbitrary, capricious, an abuse of discretion"; second, that "the Defendants actions are unconstitutional and in excess of statutory jurisdiction (i.e., ultra vires)"; and third, "Defendants' actions fail to comply with the plan-approval criterion required by law, i.e., they rely on a generic view of ventilation plans

without regard to the conditions and the mining system of the coal mine for which the plan has been submitted, as required by the Mine Act." Id.

While these complaints may describe what Plaintiffs believe to be "programmatic" deficiencies with MSHA's ventilation-plan review-and-approval process, they do not identify any discrete, final agency actions that this Court can review. Plaintiffs' allegations that "Defendants have refused to approve ventilation plans providing for the use of scrubbers based on reasons that have nothing to do with the specific conditions or circumstances at the given mine," and that Plaintiffs have "been denied the right to use scrubbers" in a number of their mines similarly fail to allege facts showing a final agency action. Id., ¶ 50.

While "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Twombly, 550 U.S. at 555, Plaintiffs must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (internal quotation omitted). Plaintiffs' broad allegations that MSHA "refused to consider" or "refused to approve" mine-ventilation plans that include the use of, among other things, scrubbers fall short of identifying a discrete Agency decision to deny a particular ventilation plan proposed by Plaintiffs during the negotiation process. Plaintiffs' assertion that Defendants "have been denied the right to use scrubbers" is similarly vague: it includes no identifying facts such as when or by what agency action such denials issued. While this type of claim may appropriately challenge Defendants' pattern and practice, see Section III.A.2.b., *supra*, it does not suffice for an APA claim.

For these same reasons, the Court cannot find Defendants acted in excess of their statutory authority (*ultra vires*) during the ventilation-plan approval process. Relying for support on the same general allegations as in Count VI, Plaintiffs in Count IV assert merely that

"Defendants are not authorized by any provision of the Mine Act to deny the Plaintiffs their right . . . to . . . use scrubbers" in their mines, and have therefore acted in excess of their statutory authority.  Compl., ¶ 78.  Plaintiffs' claims that Defendants engaged in *ultra vires* conduct is thus similarly too vague to survive under Iqbal.

At the hearing on this Motion, Plaintiffs requested that, in the event the Court found their APA and *ultra vires* claims insufficiently pled, they be granted leave to amend their complaint to more specifically allege final agency action.  Hearing Tr. at 43:2-10.  To allow such amendment would be futile, however, because neither count could withstand a motion to dismiss under Rule 12(b)(1).  See James Madison Ltd. v. Ludwig, 82 F.2d 1085, 1099 (D.C. Cir. 1996) (court can deny motion to amend complaint as futile if proposed claim would not survive motion to dismiss).

Plaintiffs' APA and *ultra vires* claims both articulate, in slightly different ways, complaints that MSHA unlawfully denied them the use of scrubbers and other specific mine-ventilation devices, without regard to the individual conditions of their mines.  Counts IV and VI thus present fact-based, particularized disputes over mine-ventilation plans themselves, rather than the higher-level procedural questions about the ventilation-plan approval-and-review process encapsulated in Plaintiffs' constitutional claims.  See GE II, 360 F.3d at 192 (distinguishing between facial, or "systematic," and as-applied, or particularized, challenges).  During the hearing, Plaintiffs described their pattern-and-practice due process claim as being "broader than just a single one-off plan dispute. . . . [T]his is their *modus operandi*."  Hearing Tr. at 13:20-22.  In contrast, Plaintiffs conceded their "APA claim is actually not a pattern and practice claim.  The APA claim is basically individual APA claims which we certainly pled as a

37

single complaint for efficiency reasons but each one of my clients could have brought separate APA claims." <u>Id.</u> at 15:15-19.

The Court must thus conclude that Plaintiffs' APA and *ultra vires* claims are not wholly collateral to the Mine Act's administrative review regime.  As a result, they fall within the Commission's exclusive jurisdiction under <u>Thunder Basin</u>.  Questions such as whether a particular ventilation device is appropriate for the conditions of an individual mine are well within the Commission's expertise and are the type of questions that the Commission has frequently resolved in the past.  <u>See, e.g.</u>, <u>Peabody Coal Co.</u>, 111 F.3d 963.  Unlike broad constitutional questions about the sufficiency of the Mine Act or MSHA's administration of it, fact-based disputes over individual mine-ventilation plans "are of the type [of claims] Congress intended to be reviewed within th[e] statutory structure."  <u>Thunder Basin</u>, 510 U.S. at 212.  As this Court would lack jurisdiction over Counts IV and VI, even if amended to allege finality, Defendants' Motion to Dismiss should be granted as to them.

## IV.     Conclusion

The Court, therefore, ORDERS that:

1)  Defendants' Motion is GRANTED IN PART and DENIED IN PART;

2)  Counts I, II, IV, and VI are DISMISSED; and

3)  Defendants shall file an answer to the remaining counts on or before September 1, 2011.


**SO ORDERED**.

                                                      /s/ *James E. Boasberg*
                                                      JAMES E. BOASBERG
                                                      United States District Judge

Date:  <u>August 18, 2011</u>